UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: __3/30/2021__

-------------------------------------------------------------:x
CBRE, INC.,                                        :
                                                   :
                          Plaintiff,               :
                                                   :        **1:17-cv-02452-ALC-SN**
            v.                                     :        **ORDER**
                                                   :
THE PACE GALLERY OF NEW YORK, INC.                 :
and THE PACE GALLERY LLC, D/B/A PACE               :
GALLERY,                                           :
                                                   :
                          Defendants.     :x
-------------------------------------------------------------
ANDREW L. CARTER, JR., District Judge:

The Court now considers a motion for partial summary judgment by Plaintiff CBRE Inc.

and a motion for summary judgment by Defendants, the Pace Gallery of New York, Inc. and the

Pace Gallery, LLC, doing business as Pace Gallery, (together "Pace"). For the reasons that follow,

CBRE's motion is GRANTED in part and DENIED in part and Pace's motion is DENIED.

## Factual Background

This matter arises from a real estate transaction by which Pace leased gallery space in New

York City's Chelsea neighborhood. CBRE contends it is due a commission on this transaction by

virtue of an exclusive right to lease contract entered by CBRE and Pace in March 2014. Pace

disagrees that CBRE is due such a commission, arguing that the March 2014 contract was not

binding on the parties, does not provide an exclusive right to lease, and that CBRE failed to

perform under the contract. Pace further argues that CBRE breached various duties to Pace by

providing information about the Chelsea real estate market to Lisa Weinberg, one of the owners

of Wenat Realty Associates ("Wenat"), a non-party that was and is Pace's landlord, and

counterparty to Pace in the at-issue transaction.

1

CBRE is a Delaware corporation authorized to do business in the State of New York with its principal place of business in Los Angeles, California. ECF No. 200 ¶ 1.The Pace Gallery of New York, Inc. is a New York corporation. The Pace Gallery LLC is a New York limited liability company that runs several art galleries. ECF No. 200 ¶ 2-3. Together, Defendants Pace Gallery of New York, Inc. and Pace Gallery LLC operate as "Pace Gallery". ECF No. 200 ¶ 4.

Around February 2014, Pace occupied the entirety of a building located at 534 West 25th Street, New York, NY pursuant to a lease with Wenat, the owner of the building. ECF No. 200 ¶ 5. Wenat is 50% owned by Samuel Weinberg and 50% by his children, Andrew and Lisa Weinberg. ECF 200 ¶ 7. With the lease at 534 West 25th Street set to expire in April 2015, ECF No. 200 ¶ 6, Christopher Harnden, Pace's Chief Operating Officer, and Marc Gilcher, Pace's Chief Executive Officer, were considering options for gallery sites, ECF No. 200 ¶ 13. Stuart Siegel, a licensed New York real estate broker working at CBRE, began discussing possible options with Harnden, ECF No. 200 ¶¶ 15-17.

*March 2014 Agreement*

On March 12, 2014, Siegel sent a proposed agreement to Harnden "pursuant to which CBRE would be given the 'exclusive right' 'to find, negotiate, and secure premises as per [Pace's] requirements, which may include a transaction at [Pace's] current premises". ECF No. 200 ¶ 18. Upon reviewing the draft agreement, Harnden emailed Siegel that he would like to exclude the subleasing of Pace's premises at 32 East 57th St because it was already the subject of an agreement with another broker, non-party Cushman Wakefield. ECF No. 200 ¶ 21. CBRE implemented this change and sent Pace an updated contract. ECF No. 200 ¶ 22. As revised and executed, the March 2014 Agreement states:

1. This letter ("agreement") shall confirm that Pace Gallery, and your designees, successors and assigns ("you") hereby grants CBRE, Inc. ("CBRE") the exclusive right to find, negotiate and secure premises as per your requirements which specifically excludes your current premises at 32 East 57th Street, which is currently being marketed for sublease. You shall refer all inquiries to us, regardless of the source and all interactions with outside parties (brokers, landlords and agents) related to this requirement will be conducted through us with participation by you.

2. CBRE will facilitate and conduct all aspects of the space evaluation, selection and negotiation strategy based upon our agreed strategy, and we will offer advice and guidance as appropriate. All business and legal decisions will be made solely by you, and binding agreements will be executed and delivered solely by you.

3. CBRE agrees to look to the owner or lessor for our commissions, provided you honor your exclusivity obligation and shall cooperate with us in obtaining a written agreement confirming same, and you agree that such payment of our commissions by another shall not affect your agreement to act exclusively through us. Notwithstanding the foregoing, if [sic] the event that you decide to renew your lease or take additional premises at 534 West 25th Street and your landlord refuses to make an agreement to pay us a full market commission, you will pay us a full market commission when the transaction is consummated.

ECF No. 157-1 at 1. Harnden reviewed, approved, and, on March 18, 2014, finalized the agreement (the "March 2014 Agreement"). ECF No. 200 ¶ 23. CBRE countersigned the March 2014 Agreement on March 18 or 19, 2014. ECF No. 200 ¶ 28. Siegel has testified that he mailed a countersigned copy of the March 2014 Agreement to Pace. ECF No. 200 ¶ 30. However, Pace contends that it did not receive a copy, and suggests Siegel's testimony that he sent it lacks credibility. *Id.*

> *Pace indicates that it, rather than CBRE, will negotiate with the Weinbergs*

From and after March 18, 2014, Siegel worked with Harnden to provide assistance with alternatives to entering a lease at 534 West 25th Street. ECF 200 ¶ 84. Siegel also provided comps[1] and other similar information. ECF No. 200 at ¶ 85. However, Pace negotiated directly with Wenat

---

[1] "Comps" is a term of art in the real estate business which refers to documents and communications comparing real estate properties for sale or lease with similar characteristics, such as size, age, and location. ECF No. 187 at 4n.11.

regarding the possibility that Pace would enter a lease for a New Building to be built at 534 West 25th Street (the "New Building"), where Pace's existing lease was. ECF No. 200 ¶ 78. Pace informed Siegel that Pace had conducted and would continue to conduct all negotiations with Sam Weinberg regarding the New Building. ECF No. 213 ¶ 386.

Pace never solicited or expected assistance from Siegel with the Wenat negotiations. ECF No. 200 ¶ 79. However, the record indicates that CBRE provided some support in the background. For example, in November 2014, as part of the ongoing negotiation between Pace and Wenat regarding leasing the New Building, Wenat made an offer of $6.5m rent per year. ECF No. 200 ¶ 64. Glimcher thought that "sound[ed] like a lot of money". ECF No. 200 ¶ 64. By email Harnden stated, in part: "I will run this by my broker [*i.e.* Siegel] for [a] reality check and to start gathering comps. But I'm curious as to how Sam will justify such a high rent." ECF No. 200 ¶ 65.

*October 2014 Request for "Comps" from Weinberg*

On October 1, 2014, Lisa Weinberg emailed Siegel seeking information about the West Chelsea real estate market. ECF No. 200 ¶ 52. Specifically, she stated that:

> Hi Stu. I believe you have spoken with my father Sam in the past along with Alan Weisman. I am trying to get some color on the market in west Chelsea near where we own property (mary boone, hasted hunt, pace). I would love some comps if you have the time to collect them for me? Please let me know and I will forward my specific parameters. Thank you in advance for your help!

ECF No. 190-23 at 2. Siegel replied: "Sure, let me know what you are looking for." ECF No. 190-2 at 1. Lisa Weinberg replied:

> Great thank you. I need to get an idea of what the market is from 19th to 29th streets, 10th to 11th avenues. Ground floor retail space as well as office space. Any size. What has been rented and what is available? And what is your feeling on where the market is heading over there? I really appreciate this help- thanks stu.

4

ECF No. 190-23 at 1. Siegel replied: "Attached are some recent comps .......We are asking $70-$85sf at 511 West 25th Street. Asking is $135sf at 541 W 25th St ...." ECF No. 190-24 at 1. The email attached a table with 14 tenants, the buildings where they lease space, and information about the terms of the leases. ECF No. 190-24 at 2. Lisa Weinberg replied: "541 w 25th is ground floor". ECF No. 200 ¶ 55. Siegel replied: "Yes ….. right opposite you …." ECF No. 200 ¶ 55.

On October 9, 2014, Lisa Weinberg sent Siegel an additional email. It stated:

> Hi stu. Is it possible for you to run a costar report for me with exact pricing per foot etc on the area of comps I asked you for? I really need to get a handle on the market there for our future development - not for our own office space search. Any and all specific info you can provide would be greatly appreciated, thank you.

ECF No. 190-25 at 1. On October 17, 2014, Siegel replied: "Hi Lisa, Sorry, I forgot to send this….." ECF No. 19-26 at 1. That email attached reports regarding spaces leased in the Chelsea neighborhood. *Id.*

*November 2014 Agreement between Pace and CBRE*

In November 2014, Pace retained CBRE pursuant to another agreement. On November 5, 2014, another CBRE broker, Paul Walker, sent Harnden an email stating: "Attached please find an agreement to sublease the entire 6th and 8th floors at 32 East 57th Street". ECF No. 200 ¶ 70. The November 2014 agreement has the subject line: "Disposition of Entire 6th & 8th Floors – 32 East 57th Street (the 'Premises') and/or Acquisition of Space". ECF No. 200 ¶ 69. In addition to terms related to subleasing 32 East 57th Street, the November 2014 Agreement contains terms that appear to contemplate Pace acquiring a lease on a new space.

The November 2014 Agreement states, in relevant part:

> You and your affiliates, designees, successors and assigns ("you" or "Client") grant to CBRE, Inc. ("CBRE", "we" or "us"), during the length of this agreement, the exclusive

right . . . (b) to find, negotiate and secure premises as per your requirements, which may include a transaction at the Premises, in accordance with the following terms and conditions: . . .

      B1. CBRE will facilitate and conduct all aspects of the space evaluation, selection and negotiation process based upon our agreed strategy, and we will offer advice and guidance as appropriate. All business and legal decisions will be made solely by you, and binding agreements will be executed and delivered solely by you.

      2. CBRE agrees to look to the owner or lessor for our commissions with respect to the acquisition of premises on your behalf, provided you honor your exclusivity obligation and cooperate with us in obtaining a written agreement confirming same; and you agree that such payment of our commissions by another shall not affect your agreement to act exclusively through us.

      3. During the term of this agreement, and for a period of Twelve (12) months after the Termination Date, you will protect CBRE on any transaction that you consummate for space that was submitted to you while this agreement was in effect. If transactional documents are out for signature at the end of such period or the transaction is still being actively negotiated, then you will continue to recognize CBRE as the procuring broker when the transaction is consummated.

ECF No. 157-2 at 1, 3. The November 2014 Agreement also includes a merger clause, which states: "This agreement: (i) expresses the parties' entire agreement on the matters covered hereinabove; (ii) supersedes all prior understandings between them on such matters, oral and written . . . ." ECF No. 157-2 at 4.

      Walker testified that he used the wrong form when creating the November 2014 Agreement and inadvertently included language related to acquiring a lease as well as subleasing. ECF No. 200 ¶ 71. This is corroborated by Harnden referring to the November 2014 Agreement as a "sublet agreement" in the email by which he returned the signed November 2014 Agreement to Walker. ECF No. 200 ¶ 72. Harnden further testified that the November 2014 Agreement did not "relate in any way to the work that Mr. Siegel and CBRE were doing for [Harnden] with respect to finding space for [Pace] that was covered by the March 18, 2014 agreement." ECF No. 190-2 (Harnden Dep. Tr.) 159:6-14.

*March 2015 Lease between Pace and Wenat*

On March 6, 2015, Pace and Wenat signed a lease for Pace to occupy five floors of the New Building. ECF No. 200 ¶ 32. That same day Pace and Wenat also signed a First Amendment of Lease with Wenat that extended Pace's then existing lease at 534 West 25th St to permit Pace to remain there until Wenat began construction on the New Building. ECF No. 200 ¶ 33-34. On June 11, 2015, Pace and Wenat signed an Amended and Restated Lease by which Pace agreed to occupy the entire New Building. ECF No. 200 ¶ 36. Together, these three agreements are the "Wenat Leases".

Pace represented in each of the Wenat Leases that Pace had not used a real estate broker in connection with the leasing of the New Building. ECF No. 200 ¶ 42. It is not clear when Pace notified CBRE regarding the Wenat Leases, or when Pace informed Wenat regarding its March 2014 Agreement with CBRE—May or June 2015. ECF No. 200 ¶¶ 42-46. However, it is undisputed that Pace told CBRE that it did not believe it was entitled to a commission for the Wenat Leases.[2] It is similarly undisputed that CBRE did not directly contact Wenat after CBRE made this position known. Neither Wenat nor Pace paid CBRE any commission on the leases related to the New Building.

## Procedural Background

---

[2] Harnden testified to a May or June 2015 conversation with Siegel. ECF No. 190-2 at 269-271:16 (Q: Do you recall a conversation with Mr. Siegel in late May 2015 or early June 2015 concerning his belief that CBRE was owed a commission on the deal that had been done at this point, the 2015 lease for the new building? Harnden: Yes; Q: And when did that occur; Harnden: in late May or early June of 2015 . . . Q: Can you tell us, to the best of your recollection [what was said]; Harnden: When I told him about our plans. he expressed dismay over his loss of commission on the deal that we would have done at 511 West 25th Street. I said sorry. that's our business decision, and  he said now I'm going to have to come after you for a commission on your Weinberg deal. And I said what are you talking about, you didn't work on that deal. And he said we have that agreement. I said don't believe our agreement covers a commission for CBRE in that deal."); 279-280 (Harnden: When he brought up the commission, I told him what are you talking about, there's no commission due on that transaction, you didn't work on it, our agreement didn't cover that").

CBRE initiated this lawsuit on April 5, 2017. By the Third Amended Complaint, it seeks to recover the unpaid commission pursuant to the March 2014 Agreement or, in the alternative, under the November 2014 Agreement. CBRE claims breach of contract (Counts I-IV), or seeks to recover in quantum meruit (Count V) or for unjust enrichment (Count VI).

For its part, Pace asserts counterclaims for breach of fiduciary duty related to the October 2014 communications between CBRE and Lisa Weinberg (Counterclaim I); for breach of contract by way of CBRE "failing to undertake rudimentary acts to ensure that Defendants received optimal lease terms favoring Defendants" (Counterclaim II); breach of implied covenant of good faith and fair dealing (Counterclaim III) and fraud (Counterclaim IV). Pace seeks rescission of the March 2014 and November 2014 Agreements, exemplary and other damages, interest, fees, costs, and disbursements, and such relief as the Court deems just and proper.

On May 26, 2020, Pace moved the Court pursuant to Rules 12 or 56 of the Federal Rules of Civil Procedure to dismiss CBRE's Third Amended Complaint in its entirety, grant summary judgment in favor of Pace on their First, Second and Third Counterclaims[3], and enter judgment in favor of Pace. That same day, CBRE cross-moved for partial summary judgment. To wit, CBRE asks the Court to find Pace liable on all Counts, strike and dismiss all of Pace's counterclaims and affirmative defenses, schedule a trial regarding damages, and grant CBRE such other and further relief as the Court determines to be just and proper. On July 16, 2020, the Parties opposed the

---

[3] Because Pace has not moved for summary judgment as to Count IV or addressed it in it briefing, but purports to move for Summary Judgment as to its whole case, the Court concludes that Pace has abandoned its fraud claim. *See Zadrowski v. Town of Plainville*, No. 3:09-cv-1367 (DJS), 2013 U.S. Dist. LEXIS 140396, at *26 (D. Conn. Sep. 30, 2013) (citing *Ferraresso v. Town of Granby*, 646 F. Supp. 2d 296, 305 (D. Conn. 2009) ("grounds alleged in the complaint, but not relied upon in summary judgment are deemed to be abandoned")). That Count is accordingly DISMISSED.

others' motion. The Parties filed their respective reply briefs in further support of their motions on August 14, 2020.

## Standard of Review

Summary judgment is appropriate where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks omitted and alteration in original). When parties cross-move for summary judgment, a court analyzes the motions separately, "in each case construing the evidence in the light most favorable to the non-moving party." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).

## Contract Interpretation on Summary Judgment

"Under New York law, which the parties agree is controlling here, the initial question for the court on a motion for summary judgment with respect to a contract claim is 'whether the contract is unambiguous with respect to the question disputed by the parties.'" *Law Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) "It is well settled that [a court's] role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract. If that intent is discernible from the plain meaning of the language of the contract,

9

there is no need to look further." *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458, 775 N.Y.S.2d 757, 761, 807 N.E.2d 869, 872 (2004).

"Whether a contract is ambiguous is a question of law for a court to determine as a threshold matter." *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003). "[A]n ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (citations and internal quotes omitted)."A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Williams v. Town of Carmel*, 175 A.D.3d 550, 106 N.Y.S.3d 333, 335 (2d Dep't 2019) (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 780 N.E.2d 166, 170, 750 N.Y.S.2d 565 (N.Y. 2002)). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (citing *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)).

### Discussion

Although there are disputes of fact here that preclude summary judgment on some issues, the Court concludes that many issues may be decided as a matter of law. As explained in detail below, the Court GRANTS CBRE's motion for summary judgment in part, and denies the remainder of the Parties' motions.

*1. Delivery of the March 2014 agreement*

As a threshold matter, the Court considers Pace's argument that the March 2014 Agreement was not binding because CBRE failed to deliver a signed version of the contract to Pace, as required under that Agreement and 19 NYCRR § 175.12. CBRE denies that delivery was a condition precedent of the March 2014 Agreement.

"Under New York law, contract formation is not defeated by nondelivery of the written document unless the parties condition its enforcement upon physical delivery." *Schenk v. Red Sage, Inc.*, 91 Civ. 7868 (BN), 1994 U.S. Dist. LEXIS 399, at *31 n.8 (S.D.N.Y. Jan. 20, 1994) (citing *Intercontinental Monetary Corp. v. Performance Guarantees, Inc.*, 705 F. Supp. 144, 148 (S.D.N.Y. 1989)). "A condition precedent is an act or event other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises. *Maxim Grp. LLC v. Life Ptnrs. Holdings, Inc.*, 2008 U.S. Dist. LEXIS 69274, at *3-4 (S.D.N.Y. Sep. 4, 2008) (citing *Oppenheimer & Co. v. Oppenheim*, 86 N.Y.2d 685, 690, 660 N.E.2d 415, 636 N.Y.S.2d 734, 737 (1995)). "Conditions [precedent] are not favored under New York law, and in the absence of unambiguous language, a condition [precedent] will not be read into the agreement." *Id.* (citing *Ginett v. Computer Task Group*, 962 F.2d 1085, 1100 (2d Cir. 1992)). Unambiguous language indicating a condition includes the terms "on condition that," "provided that," "if," "unless and until," or "null and void." *See Su Mei, Inc. v. Kudo*, 302 A.D.2d 740, 755 N.Y.S.2d 481, 483 (3rd Dep't 2003); *see also* 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 8.2 (3d ed. 2004) ("Parties often use language such as 'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to' . . . but other words may suffice.").

Here, Pace contends that a condition precedent arises from the following language in the March 2014 agreement: "Signatures may be exchanged by hand, by mail, by fax, by e-mail, or in counterparts-any such method being binding on both sides when completed and exchanged." ECF

No. 157-1 at 1. However, this phrase does not bear any of the indicia of a condition precedent. It is readily distinguishable from the language in *Brois v. DeLuca*, on which Pace relies. 154 A.D.2d 417, 418, 546 N.Y.S.2d 3, 3 (App. Div. 2nd Dept. 1989) (concluding "This Contract is not binding until executed by Seller and delivered to Purchaser" is a condition precedent). By contrast, the language in the March 2014 Agreement is a procedural clarification indicating that parties *may* execute the agreement in a variety of ways, which will all be considered effective—not a condition on which the binding nature of the contract hinges. *See e.g.*, *Bohlen Indus. of N. Am., Inc. v. Flint Oil & Gas, Inc.*, 106 A.D.2d 909, 910, 483 N.Y.S.2d 529, 530 (App. Div. 4th Dept. 1984) (concluding there was no condition precedent where the relevant language, "Paragraph 16 of the agreement[,] provides merely for procedural purposes, . . . that the agreement may be executed in counterparts and subsequently attached together.")

Pace's argument that 19 NYCRR § 175.12 requires delivery of the signed March 2014 Agreement is also without merit. That provision states:

> A real estate broker shall immediately deliver a copy of any instrument to any party or parties executing the same, where such instrument has been prepared by such broker or under his supervision and where such instrument relates to the employment of the broker or to any matters pertaining to the consummation of a lease, or the purchase, sale or exchange of real property or any other type of real estate transaction in which he may participate as a broker.

19 NYCRR § 175.12.

"When interpreting a statute, [courts] begin with the plain language of the statute, 'giving the statutory terms their ordinary or natural meaning.' " *Spadaro v. United States Customs & Border Prot.*, 978 F.3d 34, 46 (2d Cir. 2020) (citing *United States v. Lockhart*, 749 F.3d 148, 152 (2d Cir. 2014)). "When that meaning is not clear, [courts] make use of 'a variety of interpretive tools, including canons, statutory structure, and legislative history.'" *Id.* "However, when the

language of a statute is unambiguous, judicial inquiry is complete." *Id.* (citing *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002)) (internal quotations omitted).

Here, the plain language of 19 NYCRR § 175.12 shows that it does not impose the requirement Pace says it does. This provision requires a broker to "immediately deliver a copy of any instrument to any party or parties executing the same". There is no dispute that CBRE immediately delivered a copy of the March 2014 Agreement to Pace, which executed the March 2014 Agreement. Pace's assertion that Section 175.12 requires CBRE to send an executed copy of the March 2014 Agreement has no basis in the text of the provision itself, which nowhere mentions a broker's signature or execution. Pace has neither demonstrated that Section 175.12 is unclear, nor put forth any reason for this Court to look beyond the plain text of Section 175.12.

In sum, the Court concludes that Pace has failed to show delivery was a condition precedent pursuant to the March 2014 Agreement. The Court further concludes that 19 NYCRR § 175.12 does not create a delivery requirement of the sort Pace suggests, much less one that calls the formation of the March 2014 Agreement into question. Accordingly, the Court GRANTS CBRE summary judgment that there was neither a condition precedent nor statutory requirement that CBRE deliver an executed version of the March 2014 Agreement. Pace's motion for summary judgment on this basis is correspondingly DENIED.

2. *Whether the November 2014 Agreement supersedes the March 2014 Agreement*

The Court next considers whether the November 2014 Agreement superseded the March 2014 Agreement. Pace argues that this is the case based on the following language: "This agreement: (i) expresses the parties' entire agreement on the matters covered hereinabove; (ii) supersedes all prior understandings between them on such matters, oral and written . . . ." ECF No.

13

157-2 at 4. CBRE argues that the November Agreement was not intended to supersede the March 2014 Agreement, and seeks rescission.

"[W]here the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement." *Cascades, Inc. v. Experis Fin. US, LLC*, No. 12-CV-851-JTC, 2014 U.S. Dist. LEXIS 109319, at *16 (W.D.N.Y. Aug. 6, 2014) (citing *Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 100 A.D.2d 865, 867, 474 N.Y.S.2d 122 (N.Y.A.D. 2d Dep't 1984)). CBRE does not seriously dispute that the plain language of the merger clause in the November 2014 Agreement expresses such an intent. Rather CBRE argues the inclusion of the language related to taking a lease was a mutual mistake, and seeks reformation of the March 2014 Agreement.

"[A] contract can be reformed on the basis of mutual mistake if the writing does not accurately reflect the mutual intention of the parties, and [] parol evidence is admissible to establish the existence of the mutual mistake". *Invs. Ins. Co. of Am. v. Dorinco Reinsurance Co.*, 917 F.2d 100, 105 (2d Cir. 1990) (citations omitted). "Under New York law, however, there is a 'heavy presumption' that a written agreement accurately reflects the true intention of the parties. . . . ." *Id.* at 190. "Thus, '[t]he proponent of reformation must show in no uncertain terms, not only that mistake [] exists, but exactly what was really agreed upon between the parties'". *Resort Sports Network Inc. v. PH Ventures III, LLC*, 2009 NY Slip Op 6654, ¶ 3, 67 A.D.3d 132, 135-36, 886 N.Y.S.2d 5, 7-8 (App. Div. 1st Dept.) (citing *Chimart Assoc. v Paul*, 66 NY2d 570, 574, 489 NE2d 231, 498 NYS2d 344 [1986]).

Here, CBRE has come forth with sufficient evidence to raise a question of fact regarding whether there was a mutual mistake between the parties with respect to the merger clause in the

November 2014 Agreement. Specifically, Walker testified that he used the wrong form, thereby inadvertently including language related to an acquisition as well as subleasing. A contemporaneous email from Harnden identifies the November 2014 Agreement as a "sublet agreement". ECF No. 200 ¶ 72. Harnden further affirmed that the November 2014 Agreement did not "relate in any way to the work that Mr. Siegel and CBRE were doing for [Harnden] with respect to finding space for Pace that was covered by the March 18, 2014 agreement." ECF No. 190-2 (Harnden Dep. Tr.) 159:8-14. This evidence sufficiently raises a question of fact regarding mutual mistake.

Accordingly, summary judgment on whether there was a mutual mistake among the parties, and what contract is operative, must be DENIED.

### 3. Exclusive Right Agreements or Exclusive Agency Agreements

Next, the Court considers whether the March 2014 and November 2014 Agreements are "exclusive right" agreements or "exclusive agency" agreements.

A broker is entitled to a commission upon the signing of a lease only when the broker has been given the exclusive right to lease; an exclusive agency merely precludes the tenant-to-be from retaining another broker in relation to the lease. *See Rosen Assocs. Mngt. Corp. v. Suburban Props. Co.*, 2018 NYLJ LEXIS 2036, *35-36 [2018] (collecting cases). "Under New York law, 'a contract giving rise to an exclusive right of sale must clearly and expressly provide that a commission is due upon sale by the owner or exclude the owner from independently negotiating a sale.'" *Dominick & Dickerman LLC v. Deutsche Oel & Gas AG*, 756 F. App'x 58, 61 (2d Cir. 2018) (citing *Morpheus Capital Advisors LLC v. UBS AG*, 23 N.Y.3d 528, 535, 992 N.Y.S.2d 178, 15 N.E.3d 1187 (2014)).

There is no doubt that the March 2014 Agreement is an exclusive right agreement. It grants CBRE "the exclusive right to find, negotiate and secure premises as per [Pace's] requirements which specifically excludes [Pace's] current premises at 32 East 57th Street". ECF No. 157-1 ¶ 1. Pace promises to "refer all inquiries to [CBRE], regardless of the source and all interactions with outside parties (brokers, landlords and agents) related to this requirement will be conducted through [CBRE] with participation by [Pace]". *Id.* The parties further agreed that a commission would be paid by the lessor upon signing of a lease: "CBRE agrees to look to the owner or lessor for our commissions, provided you honor your exclusivity obligation and shall cooperate with us in obtaining a written agreement confirming same, and you agree that such payment of our commissions by another shall not affect your agreement to act exclusively through us." *Id.* The March 2014 Agreement expressly and unambiguously excludes Pace from independently negotiating a lease and provides for a commission to CBRE upon Pace signing a lease. This is an exclusive right agreement.

The Court reaches the same conclusion with respect to the November 2014 Agreement. Like the March 2014 Agreement, the November 2014 Agreement grants CBRE "the exclusive right . . . (b) to find, negotiate and secure premises as per your requirements, which may include a transaction at the Premises". It also makes CBRE the sole negotiatior, leaving business and legal decision to Pace: "CBRE will facilitate and conduct all aspects of the space evaluation, selection and negotiation process based upon our agreed strategy. . . . All business and legal decision will be made solely by you, and binding agreements will be  executed and delivered solely by you." ECF No. 157-2 ¶ B.1. The November 2014 Agreement also clearly anticipates the payment of commission upon leasing. It states: "CBRE agrees to look to the owner or lessor for our commissions with respect to the acquisition of premises on your behalf, provided you honor your

exclusivity obligation and cooperate with us in obtaining a written agreement confirming same; and you agree that such payment of our commissions by another shall not affect your agreement to act exclusively through us." ECF No. 157-2 at B.2. The Court concludes that this agreement also expressly and unambiguously excludes Pace from independently negotiating a lease and provides for a commission to CBRE upon Pace signing a lease.

Pace's arguments to the contrary are unpersuasive because they do not focus on the language of the agreement, where the Court must begin its analysis. Instead, Pace argues the November 2014 Agreement is not an exclusive right agreement because it does not include the same language requiring Pace to forward communications as the March 2014 Agreement. But the Court sees no ambiguity here, and therefore sees no need to use the March 2014 Agreement as parole evidence regarding the meaning of the November 2014 Agreement. Nor does the fact that the November 2014 Agreement includes language that CBRE must be recognized as the procuring agent for any deal that closes after the end of the November 2014 Agreement create ambiguity. That language extends the period for Pace to recover commission beyond the end of the agreement for a transaction initiated during the term of the agreement. Such a clause is consistent with an exclusive right or exclusive agency agreement.

Where parties have entered an exclusive right agreement, a "plaintiff [is] entitled to its commission[] without the need to prove it was the procuring cause" of the transaction. *Sioni & Partners, LLC v. Vaak Props., LLC*, 2012 NY Slip Op 1560, ¶ 3, 93 A.D.3d 414, 417, 939 N.Y.S.2d 57, 60 (App. Div. 1st Dept.) (*Rachmani Corp. v 9 E. 96th St. Apt. Corp.*, 211 AD2d 262, 268, 629 NYS2d 382 [1995])). Having concluded that the Agreements are exclusive right agreements, CBRE is relieved of the burden to show it was a procuring cause of the Wenat Leases. CBRE is GRANTED summary judgment on that issue and Pace's motion is DENIED in this respect.

4. *Definiteness of the March 2014 and November 2014 Agreements*

Next the Court considers Pace's argument that the March 2014 Agreement's use of the term "full market commission" and the November 2014 Agreement's use of "commission" makes them indefinite and unenforceable. CBRE contends that the terms are sufficiently definite. The Court agrees.

New York courts have repeatedly found that where a "contract does not specify the amount of the commission, and there is no separate brokerage agreement" a broker "is entitled to a commission that is 'fair and reasonable,' *i.e.* 'the customary rate in the community at the time when the services are rendered'". *Ga. Malone & Co., Inc. v. Extell Dev. Co.*, 2014 NY Slip Op 4581, ¶ 1, 118 A.D.3d 591, 591, 987 N.Y.S.2d 167, 168 (App. Div. 1st Dept.) (citing *Kaplon-Belo Assoc. v Cheng*, 258 AD2d 622, 622, 685 NYS2d 768 [2d Dept 1999])); *see also Premium Fin. & Realty Servs., Inc. v. 233 Broadway Owners, LLC*, 2008 NY Slip Op 51776(U), ¶ 7, 20 Misc. 3d 1137(A), 1137A, 867 N.Y.S.2d 377, 377 (Sup. Ct.) ("In any event, even assuming that the amount of plaintiff's brokerage commission was not agreed upon, a brokerage commission agreement is not rendered unenforceable if it fails to specify the rate at which the broker's commission would be computed where it is clear that the broker did not agree to work without compensation and the parties understood that the broker would be compensated at the prevailing, normal, and accepted rate. Where the parties' brokerage agreement is silent as to the specific amount of the commission, a broker is entitled to a fair and reasonable commission.").

The caselaw Pace cites to the contrary is clearly distinguishable and has no application here. For example, *Stone Key Partners LLC v. Monster Worldwide, Inc.*, 333 F. Supp. 3d 316 (S.D.N.Y. 2018), finds an agreement enforceable because it contains an impermissible agreement to agree on compensation. Nothing in the Agreements here is an agreement to agree. Pace

prominently cites *Douglas Elliman LLC v. Firefly Entm't Inc.*, a summary opinion issued by the Second Circuit regarding whether an email constituted an exclusive agency agreement. 792 F. App'x 64, 65 (2d Cir. 2019). The so-called agreement there was an email that did not "reference an exclusive agency agreement, nor . . . allude to any terms that are typically found in a contract, such as commission, duration, routes to termination, the name of a potential buyer, or remedies in the case of breach", which the Second Circuit concluded was "so indefinite that it [was] not at all clear the parties were intending to enter into an exclusive agency agreement in the first instance". *Id.* This is clearly not analogous to the Agreements here. Moreover, both *Stone Key* and *Elliman*[4] distinguished the unenforceable agreement before them from one where the commission could be derived from industry practice, such as the Agreements before the Court now.

Accordingly, the Court concludes that the March 2014 and November 2014 Agreements are not unenforceable for indefiniteness with respect to the commission term. CBRE's request for summary judgment on this point is accordingly GRANTED, while Pace's is DENIED.

5. *Faithless Servant and Breach of Fiduciary Duty Claims*[5]

---

[4] "[A] price term is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula. Where at the time of agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage." *Elliman*, 792 F. App'x at 65 (citing *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483, 548 N.E.2d 203, 548 N.Y.S.2d 920 (1989)); *Stone Key*, 333 F. Supp. 3d at (distinguishing the unenforceable agreement to agree from on where the commission could be derived from industry practice, like in *Cowen & Co., LLC v. Fiserv, Inc.*, 141 A.D.3d 18, 31 N.Y.S. 3d 494 (N.Y. App. Div. 2016)).

[5] CBRE asks the Court to grant summary judgment as to Pace's affirmative defenses and counterclaims based on CBRE's violations of general statements regarding the duties of real estate agents in the REBNY Ethics Guidelines and CBRE's website. Pace argued that these are "extensions of the Agreements". ECF No. 191 at 23. CBRE directs the Court to a merger clause in the March 2014 agreement that indicates that it "expresses the parties' entire agreements on the matters covered therein". ECF No. 191 at 24. Pace's replies that the REBNY standards and CBRE's internal ethics documents are "critical evidence establishing the standard of conduct against which Plaintiff and Siegel must be measured". ECF No. 214 at 4. The Court considers this a concession to CBRE's point regarding the merger clause, and grants summary judgment that the REBNY Ethics Guidelines and CBRE's website provisions are not part

CBRE argues for dismissal of Pace's affirmative defenses and counterclaims[6] based on breach of fiduciary duty and the faithless servant doctrine on the grounds that the October 2014 Communications are not sufficient to trigger application of the faithless servant doctrine. Pace asks the Court to decide that the October 2014 Communications showed CBRE to be a faithless servant and are a breach of fiduciary duties as a matter of law.

"New York's faithless servant doctrine holds that '[o]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary.'" *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 229 (2d Cir. 2020) (citing *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003)). "'New York courts have used two different standards to determine whether an employee's misbehavior warrants forfeiture,' and the New York Court of Appeals has not resolved which one applies in particular circumstances." *Id.* at 237 (citing *Phansalkar*, 344 F.3d at 201-02).

The first standard, which was set forth in *Turner v. Konwenhoven*, 100 N.Y. 115, 120, 2 N.E. 637 (1885), provides that: "[A] disloyal employee forfeits promised compensation only when the 'misconduct and unfaithfulness ... substantially violates the contract of service.'. . . . [C]ourts have 'found disloyalty not to be "substantial" only where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior.'" *Id.* Under the second standard, set forth in *Murray v. Beard*, 102 N.Y. 505, 508, 7 N.E. 553 (1886), "[a]n agent is held to *uberrima fides* in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing

---

of the Parties' Agreements. However the Court takes no position on the use of these documents as evidence with respect to the breach of fiduciary duty claim.

[6] This includes Pace's First through Sixth, Eighth, Twelfth, Twenty-Third and Fiftieth Affirmative Defenses and its First, Third, and Fourth Counterclaims.

with the subject of the employment, it amounts to such a fraud upon the principal, as to forfeit any right to compensation for services." *Id.*

Under New York law, "[t]o state a cause of action to recover damages for breach of fiduciary duty, a plaintiff must allege: '(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.'" *Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020) (citing *United States Fire Ins. Co. v. Raia*, 94 A.D.3d 749, 942 N.Y.S.2d 543, 545 (2d Dep't 2012)).

The Court will grant neither Pace's nor CBRE's motion. While the disclosure of the comps to Wenat without the prior consent or notification of Pace, and without informing them after, may not rise to the level of "embezzlement, improperly competing with the current employer, or usurping business opportunities", *Bluebanana Grp. v. Sargent*, 2019 NY Slip Op 07014, ¶ 1, 176 A.D.3d 408, 409, 107 N.Y.S.3d 667, 667 (App. Div. 1st Dept.), it is not so minor as the conduct in cases that CBRE cites to support its request for summary judgment. *See e.g.*, *Doe v. Solera Capital LLC*, 2019 U.S. Dist. LEXIS 55860, at *29 (S.D.N.Y. Mar. 31, 2019) ("the improper use of the firm's credit card for a total of $224.20, and the alleged snooping of admittedly sensitive information, cannot be said to rise to the level of substantial disloyalty that was present where courts have found a violation of the doctrine."). Testimony from the parties' expert witnesses, as well as Siegel himself, *see* ECF No. 202, would permit a reasonable trier-of-fact to find for either Pace or CBRE under at least the less stringent faithless servant rule. Summary judgment is therefore unwarranted on this basis.

CBRE also seeks summary judgment on the basis that Pace cannot show it was damaged by the October 2014 Communications. "When a principal seeks to recover compensation from an unfaithful servant, the principal need not allege damage other than the compensation it paid the

servant to satisfy the 'damage' element of a claim for breach of fiduciary duty under New York law." *Yukos,* 977 F.3d at 241-42. Therefore, Pace's request to be relieved of paying commission to CBRE suffices for damages.

Accordingly, the Court DENIES both parties summary judgment on the faithless servant and breach of fiduciary duty claims and associated defenses.

### 6. *Breach of duty of good faith and fair dealing*

Each party also seeks summary judgment as to Pace's claim that CBRE violated its duty of good faith and fair dealing with the October 2014 Communications. "Under New York law, a covenant of good faith and fair dealing is implied in all contracts. This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, and may thus be breached by conduct not expressly forbidden by any contractual provision." *Bevona v. SEIU*, 2007 U.S. Dist. LEXIS 34133, at *36 (S.D.N.Y. May 10, 2007) (internal quotation marks and citations omitted). The parties disagree on whether Pace has put forth sufficient evidence of bad faith. The Court declines to grant summary judgment because, like with the fiduciary duty and faithless servant claims, the record would permit a reasonable trier-of-fact to find for Pace or CBRE regarding bad faith.

### 7. *"Additional Premises" and the New Building*

The parties also both seek summary judgment on the meaning of the following clause in the March 2014 Agreement: "Notwithstanding the foregoing, if [sic] the event that [Pace] decide[s] to renew [its] lease or take additional premises at 534 West 25th Street and [Pace's] landlord refuses to make an agreement to pay us a full market commission, [Pace] will pay [CBRE ] a full market commission when the transaction is consummated". ECF No. 157-1 ¶ 3.

CBRE contends that "tak[ing] additional premises at 534 West 25th Street" unambiguously includes Pace signing a lease at the New Building, which is located at 534 West 25th Street. Pace urges an interpretation of the clause that excludes the New Building based on industry custom and usage. It contends that "[i]n the real estate business, new ground-up construction is not deemed the taking of 'additional premises.' [Instead, a] tenant takes 'additional premises' by remaining in place in its current (possibly expanded) location under a renewal lease." ECF No. 190-28 at 26-27. Evidence of custom and usage must establish that "(1) the term in question has a 'fixed and invariable usage' and (2) that the 'party sought to be bound was aware of the custom, or that the custom's existence was "so notorious" that it should have been aware of it.'" *SR Int'l Business Ins., Ltd. v. World Trade Center Prop.*, 467 F.3d 107, 134 (2d Cir. 2006) (citing *British Int'l Insur. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 84 (2d Cir. 2003)).

Here, the plain language of the clause unambiguously supports CBRE's position. It addresses the award of a commission in two specific situations: if Pace renews its lease at 534 West 25th Street or if Pace takes additional premises at 534 West 25th Street. The New Building is located at 534 West 25th Street, thereby falling within the plain meaning of the second clause.

The question then becomes whether Pace has come forth with sufficient evidence that industry custom shows this clause to be ambiguous. Pace fails to make this showing. It has not come forth with evidence that "take additional premises" has a "fixed and invariable usage" that excludes signing a lease at a new building. Pace's Expert, Susan Reingold, merely opines that the language of the clause could have been more explicit and that she herself would have drafted it more clearly to include a new building. ECF No. 190-28 at 26-27. That is not evidence of industry custom. Nor has Pace come forth with any evidence that any party was aware of this purported industry custom while contracting or that its usage was so pervasive they must have known of it.

Having failed to carry this burden, Pace has failed to raise a triable question regarding whether this clause is ambiguous by virtue of industry usage.

Accordingly, the Court GRANTS CBRE summary judgment that the term "take additional premises at 524 West 25th Street" includes the New Building, which is located at that address. Pace's motion is DENIED to the same extent.

### 8. Misuse of corporate titles, retaliation, and the automatic renewal clause

CBRE argues that Pace's claims regarding retaliation, misuse of corporate titles in violation of New York City and State law, and misuse of an automatic renewal provision in the March 2014 Agreement in violation of N.Y.C.R.R. § 175.15 lack merit. Pace has not addressed these claims in any detail in its own motion for summary judgment, nor has Pace answered the arguments made by CBRE in Pace's Opposition or Reply. "[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014). Because Pace has failed to address these arguments, the Court deems these defenses abandoned by Pace. Accordingly, the Court grants CBRE summary judgment on those defenses.

### 9. Whether CBRE "looked to" Wenat for its commission and whether Pace "honored" its exclusivity obligation and "cooperated" with CBRE

The parties both seek summary judgment that they performed and the other party breached the following clause: "CBRE agrees to look to the owner of lessor for our commissions, provided [Pace] honor[s its] exclusivity obligation and shall cooperate with [CBRE] in obtaining a written agreement confirming same . . . ". ECF No. 157-1 ¶ 3. CBRE contends that Pace committed an anticipatory breach by, *inter alia*, failing to timely notify CBRE that the Wenat Leases were being signed, indicating in the Wenat Leases that Pace acted without an agent, and refusing to help Siegel

24

secure a commission from Wenat. Pace argues that it is CBRE that breached by failing to contact Wenat or make direct efforts to get a commission agreement signed, which CBRE contends was contrary to industry practice.

"Under New York Law, a party to a contract commits an anticipatory breach of the contract when prior to the time set for performance under the contract, it declares expressly or by its conduct that it will not perform its part of the bargain." *LG Capital Funding, LLC v. PositiveID Corp.*, No. 17-CV-1297-NGG-SJB, 2019 U.S. Dist. LEXIS 126991, at *45-46 (E.D.N.Y. July 29, 2019) (citing *In re Brown Pub. Co.*, 486 B.R. 46, 54 (Bankr. E.D.N.Y. 2013). "An anticipatory breach of a contract—also known as an anticipatory repudiation—'can be either a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach or a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach'". *Princes Point Ltd. Liab. Co. v. Muss Dev. L.L.C.*, 2017 NY Slip Op 07298, ¶ 4, 30 N.Y.3d 127, 133, 65 N.Y.S.3d 89, 92, 87 N.E.3d 121, 124 [2019] (citing *Norcon Power Partners v Niagara Mohawk Power Corp.*, 92 NY2d 458, 463, 705 NE2d 656, 682 NYS2d 664 [1998]). For an anticipatory breach to be deemed to have occurred, the expression of intent not to perform by the breach must be "positive and unequivocal". *Id.*

Here, it is undisputed that Pace made clear to CBRE that it did not believe it was entitled to a commission from the Wenat Leases during the May or June 2015 meeting between Siegel and Harnden. While it is yet an open question whether Pace's view is correct, Pace's statements clearly and unequivocally communicated that it did not intend to cooperate with CBRE in receiving its commission. The Court concludes this constitutes an anticipatory breach.

Having concluded that Pace engaged in an anticipatory breach, the Court also concludes that CBRE was relieved of its duty to look to Wenat for a commission. CBRE had to look to Wenat

for its commission "provided that" CBRE had the cooperation of Pace. When Pace unequivocally withheld its cooperation CBRE was relieved of the requirement to seek the commission from Wenat. There are some disputes of fact regarding exactly when this conversation took place and whether, afterwards, it would have been routine or prudent for CBRE to contact Wenat directly. However, these issues of fact are not material to whether CBRE had a contractual obligation to do so in the face of a clear expression by Pace that it would not cooperate with CBRE in obtaining a written agreement confirming same. CBRE did not.

Accordingly, CBRE is GRANTED summary judgment that it was relieved of its duty to look to Wenat for a commission by virtue of Pace's anticipatory breach. Pace's motion for summary judgment is correspondingly DENIED.

### Conclusion

In summary, the Court GRANTS summary judgment to CBRE on the following issues:

- Delivery was not a condition precedent to the formation of the March 2014 Agreement;

- The March 2014 and November 2014 Agreements confer exclusive rights to lease on CBRE, which therefore need not prove it is the procuring cause of the Wenat Leases;

- The March 2014 and November 2014 Agreements are not unenforceable for lack of a definite commission term;

- The REBNY Ethics Guidelines and CBRE Website are not incorporated into the Agreements;

- "Taking additional premises at 534 West 25th Street" includes Pace signing a lease for the New Building, which is located at that address;

- The misuse of corporate titles, retaliation, and automatic renewal clause defenses or counterclaims are abandoned, and summary judgment is granted in CBRE's favor; and

- CBRE was relieved of its duty to "look to" Wenat for a commission after Pace made clear it did not believe CBRE was entitled to a commission for the Wenat Leases, which was an anticipatory breach.

The Parties' motions for summary judgment are otherwise DENIED.

**SO ORDERED.**
**Dated: March 30, 2021**
      **New York, New York**

 

**ANDREW L. CARTER, JR.**

**United States District Judge**