# EXHIBIT A

UNITED STATES DISTRICT COURT          CASE NO.17-cv-02452

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------X

CBRE, INC.,

                     Plaintiff,

         -against-

THE PACE GALLERY OF NEW YORK, INC. AND THE PACE
GALLERY, LLC, D/B/A PACE GALLERY,

                   Defendants.

-------------------------------------------------------------------------------X

# EXPERT REPORT OF SUZY A. REINGOLD PURSUANT TO
## FEDERAL RULES OF CIVIL PROCEDURE 26(a)(2)(B)

Table of Contents

EXPERT QUALIFICATIONS AND FEES...................................................................1

STATEMENT OF FACTS......................................................................................2

ISSUES, ANALYSIS AND OPINIONS....................................................................9

ISSUES..........................................................................................................9

ANALYSIS AND OPINIONS................................................................................11
    A. ISSUES AND OPINIONS AS TO BREACH OF FIDUCIARY DUTY AND
       CONFLICTS OF INTEREST.....................................................................11

    B. ISSUES AND OPINIONS RELATING TO FIRST AGREEMENT....................25

        I.    CBRE DID NOT "FIND, NEGOTIATE AND SECURE PREMISES"
            (FIRST AGREEMENT, EX. 18, PARAGRAPH 1)..............................25

        II.   CBRE WAS NOT THE PROCURING CAUSE....................................25

        III.  PACE DID NOT RENEW ITS LEASE OR TAKE ADDITIONAL
            PREMISES AT 534 WEST 25TH STREET (FIRST AGREEMENT,
            EX. 18, PARAGRAPH 3)...............................................................26

        IV.  THE FIRST AGREEMENT (EX. 18) PROVIDED THAT CBRE MUST,
            IN THE FIRST INSTANCE, SEEK ITS ALLEGED COMMISSION
            FROM THE LANDLORD, WHICH CBRE DID NOT DO......................27

        V.   THE CLAUSE "FULL MARKET COMMISSION" IS NOT DEFINED
            (FIRST AGREEMENT, EX. 18, PARAGRAPH 3)..............................29

        VI.  CBRE RETALIATED AGAINST PACE.............................................31

        VII.  THERE IS NO EVIDENCE THAT CBRE DELIVERED THE FULLY
            EXECUTED FIRST AGREEMENT (EX. 18), AS REQUIRED BY THE
            FIRST AGREEMENT (EX. 18, PARAGRAPH 6).............................32

        VIII. THE FIRST AGREEMENT (EX. 18, PARAGRAPH 4) CONTAINS
            A PROHIBITED AUTOMATIC RENEWAL CLAUSE...........................33

IX.   CBRE ADDED DE MINIMIS VALUE..............................................33

C. ISSUES AND OPINIONS RELATING TO SECOND AGREEMENT...............35

D. ISSUES AND OPINIONS CONCERNING CBRE'S PRACTICE OF
   DESIGNATING CORPORATE TITLES TO ITS ASSOCIATE BROKERS
   AND SALESPERSONS............................................................36

CONCLUSIONS.................................................................................39

## EXPERT QUALIFICATIONS AND FEES

1.      I am Suzy A. Reingold, an attorney licensed in New York, and a real estate broker, also licensed in New York.  My experience as a real estate attorney, real estate management professional and consultant, my educational background and my professional affiliations are set forth in my curriculum vitae (Ex. 1).  A substantial part of my professional experience relates to the management of real estate commercial office brokerage professionals, particularly dispute resolution and professional ethics training, monitoring and enforcement.

2.  Over the past four years, I have appeared and provided deposition and trial testimony as follows:
    Republic Realty v. Kuafu Properties, et al, Supreme Court of New York, Case #652280/2016, deposed May 15, 2018; testified as an expert at hearing November 1 and 19, 2018.

3.  My fees in this matter are as follows: $800 per hour for pre-trial consultation and expert opinion; $1200 per hour for being deposed and testifying at trial; and $25,000 for preparation and completion of expert report.

4.  I have reviewed the following materials in connection with my review of this case:
    i.      Plaintiff's Second Amended Complaint (Ex. 2);
    ii.    Defendants' Second Amended Answer With Affirmative Defenses (Ex. 3);
    iii.   Deposition transcript of Stuart Siegel, dated February 5, 2019, and Exhibits (1-14) ("Siegel Deposition," Ex. 4);[1]
    iv.   Deposition transcript of Christopher Harnden, dated February 12, 2019, and Exhibits (1-39) ("Harnden Deposition," Ex. 5);
    v.    Deposition transcript of Marc Glimcher, dated April 2, 2019, and Exhibits (Ex. 40 and Exs. 1, 5, 7, 16, 24, 25, 27, 28, 29, 34, 36, 38 and 39 from Harnden Deposition) ("Glimcher Deposition," Ex. 6);

---

[1] The deposition transcripts annexed hereto do not contain the Exhibits to the deposition but are fully incorporated herein by reference.

1

vi.  Deposition transcript of Samuel Weinberg, dated April 19, 2019, and Exhibits (Weinberg 1-5 and Pace 1-10) ("S. Weinberg Deposition," Ex. 7);

vii.  Deposition transcript of Lisa Weinberg, dated May 1, 2019, and Exhibits (Exs. A-K and Exs. 10, 25, 29 and 39 from Harnden transcript) ("L. Weinberg Deposition," Ex. 8);

viii.  Deposition transcript of Kim Brennan, dated May 12, 2019, and Exhibits (1-26) ("Brennan Deposition," Ex. 9);

ix.  Deposition transcript of Paul Walker, dated June 5, 2019, and Exhibits (1-28) ("Walker Deposition," Ex. 10);

x.  Deposition transcript of Brett Kaye, dated June 12, 2019, and Exhibits (1-18) ("Kaye Deposition," Ex. 11);

xi.  Deposition transcript of Matthew Bergey, dated June 18, 2019, and Exhibits (1-14) ("Bergey Deposition," Ex. 12);

xii.  Deposition Transcript of Elaine Kleinberg, dated June 20, 2019, and Exhibits (1-11) ("Kleinberg Deposition," Ex. 13);

xiii.  New York State Broker's License Law (Real Property Law – Article 12-a, §§ 441-C(1)(a), 441(1)(b), 441-B(2) and 440(2), Ex. 14);

xiv.  New York State Rules and Regulations – Real Estate Brokers and Salespersons (19 N.Y.C.R.R. §§ 175.12, 175.15 and 175.22, Ex. 15);

xv.  "Automatic Renewal Clauses in Exclusive Listing Agreements" by Charles Botensten and notation by Neil B. Garfinkel (Ex. 16);

xvi.  Glossary of Real Estate Terms published by Real Estate Board of New York (Ex. 17);

xvii.  Alleged agreement for brokerage services between Plaintiff ("CBRE") and Defendants ("Pace"), dated as of March 18, 2014 (the "First Agreement," Ex. 18);

xviii.  Alleged agreement for brokerage services between CBRE and Pace, dated as of November 5, 2014 (the "Second Agreement," Ex. 19);

xix.  Code of Ethics and Professional Practices issued by Real Estate Board of New York (Ex. 20);

xx.  CBRE's Standards of Business Conduct (Ex. 21);

xxi.     CBRE's Managing Conflicts of Interest (Ex. 22);

xxii.    Lease between Wenat Realty Associates LP and the Pace Gallery LLC, dated as of March 6, 2015 (Ex. 23);

xxiii.   First Amended of Lease between Wenat Realty Associates LP and the Pace Gallery LLC, dated as of March 6, 2015 (Ex. 24);

xxiv.    Amended and Restated Lease between Wenat Realty Associates LP and the Pace Gallery LLC, dated as of June 11, 2015 (Ex. 25);

xxv.     October 1, 2014 email at 9:59 a.m. from Lisa Weinberg to Stuart Siegel Ex. 26 (Ex. 26);

xxvi.    October 1, 2014 email at 11:48 a.m. from Stuart Siegel to Lisa Weinberg (Ex. 27);

xxvii.   October 1, 2014 email at 12:13 p.m. from Lisa Weinberg to Stuart Siegel (Ex. 28);

xxviii.  October 1, 2014 email at 3:16 p.m. from Stuart Siegel to Lisa Weinberg (Ex. 29);

xxix.    October 1, 2014 email at 3:21 p.m. from Lisa Weinberg to Stuart Siegel (Ex. 30);

xxx.     October 1, 2014 email at 3:25 p.m. from Lisa Weinberg to Stuart Siegel (Ex. 31);

xxxi.    October 1, 2014 email at 3:26 p.m. from Stuart Siegel to Lisa Weinberg (Ex. 32);

xxxii.   October 1, 2014 email at 3:28 p.m. from Lisa Weinberg to Stuart Siegel (Ex. 33);

xxxiii.  October 9, 2014 email at 3:05 p.m. from Lisa Weinberg to Andrew Weinberg (Ex. 34);

xxxiv.   October 9, 2014 email at 3:07 p.m. from Lisa Weinberg to Stuart Siegel (Ex. 35);

xxxv.    October 17, 2014 email at 4:22 p.m. from Stuart Siegel to Lisa Weinberg (Ex. 36);

xxxvi.   October 17, 2014 email at 4:23 p.m. from Lisa Weinberg to Andrew Weinberg (Ex. 37);

xxxvii. April 6, 2000 Lease between Wenat Realty Associates and Pace-Wildenstein, dated as of April 6, 2000 (Ex. 38);

xxxviii. New York State Department of State Opinion, dated April 26, 2013 (Ex. 39);

xxxix. New York State Department of State Opinion, dated August 20, 2013 (Ex. (Ex. 40);

xl.  August 27, 2013 REBNY Bulletin by Neil B. Garfinkel (Ex. 41);

xli.  March 23, 2017 Memorandum by Neil B. Garfinkel (Ex. 42);

xlii.  February 25, 2014 email at 4:30 p.m. from Stuart Siegel to Chris Harnden (Ex. 43);

xliii.  CBRE website entry for Stuart Siegel (Ex. 44);

xliv.  New York State license details for Stuart Siegel (Ex. 45);

xlv.  November 18, 2014 email at 12:50 p.m. from Paul Walker to Elaine Kleinberg (Ex. 46);

xlvi.  CBRE website entry for Paul Walker (Ex. 47);

xlvii.  New York State license details for Paul Walker (Ex. 48);

xlviii.  February 18, 2014 email at 4:34 p.m. from Matt Bergey to Chris Harnden (Ex. 49);

xlix.  CBRE website entry for Matt Bergey (Ex. 50);

l.  New York State license details for Matt Bergey (Ex. 51);

li.  February 18, 2014 email at 3:37 p.m. from Brett Kaye to Stuart Siegel (Ex. 52);

lii.  CBRE website entry for Brett Kaye (Ex. 53);

liii.  New York State license details for Brett Kaye (Ex. 54);

liv.  July 21, 2015 email at 5:21 p.m. from Stuart Siegel to Chris Harnden (Ex. 55); and

lv.  May 14, 2015 email at 12:24 p.m. from Stuart Siegel to Matt Bergey and Brett Kaye with an internet link to an April 3, 2015 announcement from Pace (Ex. 56).

## STATEMENT OF FACTS

5.     Pursuant to a Lease Agreement dated as of April 6, 2000, between Wenat Realty
       Associates LP ("Weinberg") and Pace-Wildenstein, which subsequently changed
       its name to The Pace Gallery LLC (Ex. 5, 23:10-21) ("2000 Lease," Ex. 38), Pace
       leased the premises at 534 West 25th Street ("Premises") (also known as 534-
       548 West 25th Street, and presently known as 540 West 25th Street).  Pursuant to
       the 2000 Lease (Ex. 38), the term of the lease commenced on May 1, 2000 and
       was to end on April 30, 2015.  Samuel "Sam" Weinberg is the principal owner of
       Weinberg and is a 50% owner of Weinberg and his daughter Lisa Weinberg and
       son Andrew Weinberg own the remaining 50% of Weinberg (Ex. 7, 16:2-11).  The
       Weinberg Properties website at
       http://www.weinbergproperties.com/executives.asp states that Sam Weinberg is
       the President and CEO, Lisa Weinberg is the Vice President of Leasing and
       Andrew Weinberg is the Vice President of Development and Acquisitions.

6.     The Second Amended Complaint, dated April 26, 2018 ("SAC," Ex. 2),
       references two alleged agreements for brokerage services between Plaintiff
       ("CBRE") and Defendants ("Pace"), dated, respectively, as of March 18, 2014
       (the "First Agreement," Ex. 18) and November 5, 2014 (the "Second Agreement,"
       Ex. 19).

7.     One issue that arises is the validity of claims of entitlement to a commission by
       CBRE based upon the actions of Stuart Siegel ("Siegel"), employee of CBRE,
       and other CBRE employees in possible violations of New York law and in
       contravention of established brokerage ethics practices set forth by the Real
       Estate Board of New York ("REBNY") Code of Ethics and Professional Practices
       ("REBNY Code of Ethics," Ex. 20) and the major real estate brokerage firms,
       CBRE's Standards of Business Conduct ("CBRE's Business Conduct Rules," Ex.
       21) and CBRE's Managing Conflicts of Interest ("CBRE's Conflicts Rules," Ex.
       22).

8.    In the First Agreement (Ex. 18, paragraph 1), Pace agreed to engage the services of CBRE to "find, negotiate and secure premises as per your requirements." CBRE agreed to look to any owner or lessor for any commission.

9.    The First Agreement (Ex. 18, paragraph 3) further provided that if Pace renewed its lease or took additional space in the building ("Original Building") at the Premises, Pace would pay CBRE "a full market commission" if the landlord refused to do so. There is no schedule of commission rates or definition of "full market commission" attached to or in the First Agreement (Ex. 18) nor was any such rate schedule ever provided to Pace.

10.   The First Agreement (Ex. 18) does not include or mention any obligation for Pace to pay CBRE a commission if a lease is entered into with Pace's current landlord, Wenat Realty Associates LP ("Weinberg"), for a newly constructed building, i.e., "ground up" construction ("New Building").

11.   Harnden testified (Ex. 5, 32:18-33:9; 40:5-17; 46:18-47:5) that Pace's understanding and intention was to engage CBRE **solely** to potentially identify an **alternative** to the current premises or the New Building or to supplement space in the New Building with a back office location. The intent and actions of the parties were to engage CBRE only for alternative or supplemental space.[2]

12.   From the outset, CBRE expressly acknowledged and understood that it was aware that Pace was negotiating directly with Weinberg regarding the possibility of a new lease in the New Building and had been speaking with Weinberg "for quite some time" (since 2007 or 2008) about such a possibility (Ex. 4, 42:3-43:5; 51:9-54:1; Ex. 5, 35:20-36:9; 95:12-21; Ex. 13, 194:13-17).

---

[2] CBRE was looking for a potential "alternative" space opportunity in which Pace would be a tenant. This would serve as an alternative to Pace taking space in Weinberg's New Building, which, at the time Pace engaged CBRE, had not yet been constructed as Weinberg still needed to demolish the old building and construct a new one (Ex. 5, 33:3-18; 40:5-17; 47:2-5; 60:7-11; 63:12-15; 154:21-155:3).

13.   CBRE acknowledged that it would not be performing any services with respect to the negotiations between Pace and Weinberg (Ex. 4, 161:13-21; 196:8-17; 200:13-23).  In fact, if those negotiations had resulted in Pace staying at the Premises because "Sam had decided not to build," CBRE had made provision in the First Agreement (Ex. 18) to seek a commission for such renewal or taking additional space, looking to Pace only if Weinberg refused to pay after CBRE undertook its contractual obligation to look to the landlord (i.e., Weinberg) for its commission in the first instance.

14.   Over the course of the twelve months subsequent to the signing of the First Agreement (Ex. 18), CBRE (through Siegel) submitted various **alternative** space opportunities to Pace.  Simultaneously, as agreed to by CBRE, Pace continued its discussions with Weinberg to enter into a new lease in the New Building without any contribution or input from Siegel.

15.   During the contract period, specifically commencing on October 1, 2014, and unbeknownst to Pace, Siegel was asked by Lisa Weinberg (daughter of Samuel Weinberg and Vice President of Leasing of Weinberg) for market information to assist her with the pricing of Weinberg's proposed development, i.e., the New Building, so as to be competitive in the market.  Siegel, without oral or written **prior** consent or even a **prior** conversation with Pace, promptly responded, commencing on October 1, 2014, and over the next couple of weeks, until and including October 17, 2014, provided a variety of comparable transactions ("comps") and asking prices to Lisa Weinberg.  At no time did Siegel disclose to Lisa Weinberg or anyone else at Weinberg the following:

    i.    CBRE was the exclusive broker for Pace (Ex. 8, 33:20-35:8; Ex. 4, 230:8-18);

    ii.    CBRE was working with Pace in seeking alternatives to the New Building; and

    iii.    If CBRE believed that it would be entitled to a commission in any transaction with Pace, CBRE was obligated to seek such commission from Weinberg (Ex. 4, 55:5-18; 58:3-13).

16.    No facts presented by CBRE or Pace indicate that Siegel ever mentioned Pace to Lisa Weinberg or advised Pace (or his contact there, Harnden) or CBRE in writing or otherwise of the contact, communications and/or the supplying of comps and a CoStar report to Lisa Weinberg.

17.    As of March 6, 2015, Pace entered into a new lease (the "First Lease") with Weinberg for approximately one-half of the New Building (Ex. 23).

18.    Simultaneously, Pace agreed to extend the 2000 Lease for the Premises of the Original Building (Ex. 38) for a short term by executing the First Amendment of Lease, dated as of March 6, 2015 ("Short-Term Lease," Ex. 24).  At no time did CBRE seek a commission for the Short-Term Lease (Ex. 24) transaction.

19.    CBRE was well aware of the First Lease (Ex. 56; Ex. 23) and, through Siegel, continued its search for back office space to supplement Pace's space in the New Building.

20.    While the search for new or supplemental space was ongoing, CBRE and Pace entered into the Second Agreement (Ex. 19), which was a standard agreement regarding space at Pace's location at 32 East 57th Street for Pace's disposition and acquisition of premises.  No reference was made to the First Agreement (Ex. 18).  CBRE claims that the inclusion in the Second Agreement (Ex. 19) of contract clauses concerning the acquisition of premises was a mistake (Ex. 13, 114:13-22; Ex. 10, 63:9-64:2), contrary to CBRE's pleadings (Ex. 2, paragraphs 45-47).

21.    With respect to the acquisition of new space under the Second Agreement (Ex. 19, Paragraph B.2), CBRE agreed to look to the owner or lessor for any commission.

22.    The Second Agreement (Ex. 19) provides in Paragraph C.5(ii) that it "supersedes all prior understandings...oral or written."

23. After the signing of the First Lease (Ex. 23), Pace continued to work with CBRE to find back office space. The parties were close to terms on a space at 511 West 25th Street.

24. As of June 11, 2015, Pace entered into an Amended and Restated Lease (the "Second Lease," Ex. 25) with Weinberg whereby Pace agreed to lease the entire New Building, i.e., all eight floors. Shortly before entering into the Second Lease (Ex. 25), Pace advised CBRE that it would no longer pursue a transaction at 511 West 25th Street or any other alternative space.

25. Upon learning that Pace was about to sign or had signed the Second Lease (Ex. 25) and realizing that no commission would be earned from supplemental space, CBRE, through Siegel, in retaliation for Pace's decision not to lease space at 511 West 25th Street, demanded to be paid a commission for the leasing in the New Building and brought this suit under either or both the First Agreement (Ex. 18) and Second Agreement (Ex. 19).

26. Both the First Lease (Ex. 23) and Second Lease (Ex. 25) stated that no broker was involved in the transaction and each contained standard mutual indemnities by landlord and tenant against any brokerage claims (Article 28.1 and 29.1(A)(4) of both leases).

## ISSUES, ANALYSIS AND OPINIONS

**ISSUES:**

27. I have been asked by Pace to set forth my expert opinions as to the issues listed below. My opinions are based upon my understanding and experiences related to practices and ethics undertaken either by custom or law in New York City commercial real estate brokerage firms. These opinions are firmly grounded in my extensive experience as a manager of commercial real estate brokers, a

provider of broker training in practical skills and ethics, a designated company conflict of interest officer and a real estate attorney.

28.     The issues I have been asked to address are:

A.      Based on brokerage laws, regulations, practices and procedures, did CBRE and its associate broker, Siegel, breach their fiduciary duty to Pace?  If so, what are the implications of that breach?

B.      What are the relevant provisions of the First Agreement (Ex. 18)?  Did CBRE breach the First Agreement (Ex. 18)?

C.      Did Pace breach the First Agreement (Ex. 18)?

D.      Was the First Agreement (Ex. 18) typical under the usual practices and procedures employed by commercial real estate brokerage firms in New York City?

E.      If the First Agreement (Ex. 18) or Second Agreement (Ex. 19) controls, is there an obligation on the part of Pace to pay a commission to CBRE?  If so, how is that commission determined under the usual practices and procedures employed by commercial real estate brokerage firms in New York City?

F.      Is there an industry standard definition of "full market commission"?

G.      Did the Second Agreement (Ex. 19) supersede the First Agreement (Ex. 18)?

H.      If the Second Agreement (Ex. 19) controls, is there an obligation on the part of Pace under the Second Agreement (Ex. 19) or by custom in the industry to pay a commission to CBRE?

I.      From a brokerage firm's perspective, did the First Agreement (Ex. 18) and
        CBRE's actions comply with New York State laws and regulations
        governing brokerage agreements and broker titles?

**ANALYSIS AND OPINIONS**:

**A.      ISSUES AND OPINIONS AS TO BREACH OF FIDUCIARY DUTY AND
         CONFLICTS OF INTEREST**

29.     The most troubling aspect of CBRE's demand for a commission from Pace
        is CBRE and Siegel's multiple breaches of fiduciary duty owed to Pace,
        and the unresolved conflicts of interest created solely by Siegel
        concerning Siegel, Pace and Weinberg.

30.     The following is a detailed chronology of all 11 e-mails exchanged
        between Siegel and Lisa Weinberg and the two e-mails exchanged
        between Lisa Weinberg and her brother Andrew Weinberg:

        i.      **10/1/14  9:59 a.m. – Lisa Weinberg to Siegel (Ex. 26) (emphasis
                added);**

                "Hi Stu. I believe you have spoken with my father Sam in the
                past along with Alan Weisman. *I am trying to get some color
                on the market in west Chelsea near where we own property*
                (mary boone, hasted hunt, *pace*). I would love some *comps*
                if you have the time to collect them for me? Please let me
                know and I will forward my specific parameters. Thank you
                in advance for your help!"

        ii.     **10/1/14  11:48 a.m. – Siegel to Lisa Weinberg (Ex. 27)
                (emphasis added);**

                "Hi Lisa,
                Sure, *let me know what you are looking for.....*
                Stuart"

11

iii. **10/1/14  12:13 p.m. – Lisa Weinberg to Siegel (Ex. 28) (emphasis added);**

> "Great thank you. I need to get an idea of *what the market is* from 19th to 29th streets, 10th to 11th avenues. *Ground floor retail space* as well as office space. *Any size.* What has been *rented and what is available*? And what is *your feeling on where the market is heading* over there? I really appreciate this help- thanks stu."

iv. **10/1/14  3:16 p.m. – Siegel to Lisa Weinberg (Ex. 29) (emphasis added);**

> "Hi Lisa,
> *Attached are some recent comps* ........
> We are asking $70-$85sf at 511 West 25th Street. Asking is $135sf at 541 W 25th St...."

> NOTE: Siegel's attachment to his e-mail is titled "Chelsea Lease Comps.xlsx", which contains detailed information concerning 12 comps, is part of Ex. 29.

v. **10/1/14  3:21 p.m. – Lisa Weinberg to Siegel (Ex. 30);**

> "541 w 25th is ground floor?"

vi. **10/1/14  3:21 p.m. – Siegel to Lisa Weinberg (Ex. 30);**

> "Yes ..... right opposite you...."

vii. **10/1/14  3:25 p.m. – Lisa Weinberg to Siegel (Ex. 31);**

> "Got it thank you so much for this I really appreciate it."

viii. **10/1/14  3:26 p.m. – Siegel to Lisa Weinberg (Ex. 32) (emphasis added);**

> "You bet, *please send my best to Sam*!"

ix. **10/1/14  3:28 p.m. – Lisa Weinberg to Siegel (Ex. 33);**

> "I will!"

   x. **10/9/14  3:05 p.m. – Lisa Weinberg to Andrew Weinberg (Ex. 34);**

        *No message.*
        Lisa Weinberg forwarded to her brother Andrew Weinberg, the Siegel 10/1/14 3:16 p.m. e-mail to Lisa Weinberg *with* the attachment containing the 12 detailed comps.

   xi. **10/9/14  *3:07 p.m.* – Lisa Weinberg to Siegel (Ex. 35) (emphasis added);**

        "Hi stu.  Is it possible for you to *run a costar report for me with exact pricing per foot etc on the area of comps I asked you for?* I really need to get a handle on the market there for *our future development* - not for our own office space search.  Any and all specific info you can provide *would be greatly appreciated,* thank you."

   xii. **10/17/14  4:22 p.m. – Siegel to Lisa Weinberg WITH an attachment containing a 35 page CoStar report for the entire Chelsea area (Ex. 36); and**

        "Hi Lisa,
        Sorry, I forgot to send this......"

        NOTE: The attachment is the 35 page comprehensive and detailed CoStar report for the entire Chelsea neighborhood.

   xiii. **10/17/14  4:23 p.m. – Lisa Weinberg to Andrew Weinberg (Ex. 37)**

        No message:

        Lisa Weinberg forwarded to her brother Andrew Weinberg the 10/17/14 4:22 p.m. e-mail from Siegel to Lisa Weinberg with the attachment containing the same 35-page CoStar report.

31.   These e-mails and their attachments demonstrate: a breach of the fiduciary duty between a broker and its client and the creation and willful disregard of conflicts of interest among CBRE, its exclusive client Pace and Weinberg.  These breaches of fiduciary duty and creation of

unresolved conflicts of interest violate, inter alia, New York law, statutes,

the REBNY Code of Ethics (Ex. 20), CBRE's Business Conduct Rules (Ex.

21) and CBRE's Conflicts Rules (Ex. 22).

32.  RPL Article 12A, Section 441-C(1)(a) (Ex. 14), concerning the licensing of

real estate brokers, provides, in relevant part, that "untrustworthiness or

incompetency" of a broker is cause for suspension or revocation of his

license, as follows:

> "The department of state may revoke the license of a real estate
> broker or salesman or suspend the same… if such licensee has
> been guilty of fraud or fraudulent practices, or for dishonest or
> misleading advertising, or has demonstrated **untrustworthiness or
> incompetency** to act as a real estate broker or salesman, as the
> case may be" (emphasis added).

33.  A breach of fiduciary duty certainly demonstrates incompetency or

untrustworthiness.  RPL Section 441(1)(b) (Ex. 14) defines the standards

for obtaining a broker license, which include "a general and fair

understanding of the obligations between principal and agent," as follows:

> "(b) Such further information as the department may reasonably
> require shall be furnished by the applicant including sufficient proof
> of… his or their competency to transact the business of real estate
> broker in such a manner as to safeguard the interests of the public.
> In determining competency, the department shall require proof that
> the person being tested to qualify to apply for a broker's license
> has… a general and fair understanding of the obligations between
> principal and agent, as well as of the provisions of this section."

34.  A principal is owed **undivided loyalty** from the agent.

35.  REBNY is recognized by owners, brokers and other real estate

professionals in New York City as their industry representative.  CBRE

and Siegel are members of REBNY and, as such, are bound by the

REBNY Code of Ethics (Ex. 20; Ex. 9, 134:12-14; 134:19-20; 135:4-9).

Paragraphs II.A(2) and (6) provide, in pertinent part, the following (Ex. 20):

"Members shall. . . (2) follow the highest moral and ethical standards of courtesy, integrity, proficiency, professionalism and *honesty*. . .(6) when representing a. . .tenant. . .as an agent, *protect and promote the interest of their client*. This obligation of fidelity to the client's interests *is primary*, but it does not relieve Members of their obligation to treat all parties *honestly*. . ." (emphasis added).

36.   In REBNY's published "Glossary of Real Estate Terms" (relevant portions attached hereto as Ex. 17), REBNY defines fiduciary and states that "such relationship implies great confidence and trust".

37.   CBRE's Business Conduct Rules state, in pertinent part (Ex. 21, pp. 18-19):

> **"Fiduciary Duties**
>
> The nature of the real estate services business often results in CBRE owing 'fiduciary duties' to third parties, most often our clients. *A fiduciary duty is the highest standard of duty under the law*. Owing a fiduciary obligation to someone *requires us to place that person's interests above our own, to act with due care, to disclose conflicts of interest and to make our decisions in that person's interests*. Breaching a fiduciary obligation to a client can have serious legal consequences to you, our clients and CBRE. When representing clients, *you are expected to comply with all laws* that govern our business operations, *which typically require written disclosure and client consent* of conflicts.
>
> *Please seek guidance* from a member of the Legal or Compliance Departments *if you are unsure as to whether fiduciary duties exist in any situation* or the appropriate course of conduct when interacting with the firm's clients" (Ex. 21, pp. 18-19) (emphasis added).

CBRE's flippancy and disregard for the fiduciary duties owed to its clients is underscored by the testimony of Kleinberg—a CBRE manager and attorney—that CBRE's Business Conduct Rules "was *sort of* guidelines" (Ex. 21; Ex. 13, 30:9-13) (emphasis added).

38. CBRE's Conflicts Rules provide, in pertinent part (Ex. 22, pp. 2-5 and 10-11):

> "CBRE is sensitive to potential engagements that might be legally permissible and not technically posing conflicts of interests, **but problematic from a client relations perspective.** These business selection issues, if not promptly identified and properly managed, may lead to ill-will and a loss of business…
>
> When we make decisions as to what assignments to accept and how to manage conflicts if and when they arise, **we will always adhere to our fiduciary duties and place the interests of the client we represent ahead of our own.**
>
> . . .
>
> **How do we define conflicts of interest?**
> There is no single universally recognized definition of a conflict of interest. For us, a conflict of interest arises whenever CBRE or its employee:
>
> . . .
>
> represents or seeks to represent two or more parties whose interests are actually *or potentially* in conflict with each other;
>
> . . .
>
> Some of the standards we employ to identify and manage conflicts are described below:
>
> **Compliance with Law**
> *We comply with all laws and regulations relating to our business.*
>
> CBRE is subject to a myriad of federal, state or province, and local laws throughout dozens of countries, including real estate licensing laws in the jurisdictions where it operates. **Per our Standards of Business Conduct, compliance with the relevant laws and regulations is a non-negotiable condition of employment with CBRE.**
>
> . . .
>
> **Clarity in our Role**
> *CBRE will be clear about its role and responsibilities in any assignment.*
>
> At the outset of any assignment we accept, we will clearly articulate our role and our specific responsibilities to our client. CBRE personnel are trained to be unambiguous regarding the party represented by CBRE in any transaction **and to disclose the client relationship at the earliest possible time to all parties to the transaction.**

**Obligation to Disclose Conflicts**
*It is CBRE policy to disclose to our client all known conflicts of interest.*

All CBRE personnel who interact with clients have a responsibility to **identify and disclose any actual or _potential_ conflict that exists or is reasonably likely to occur** in the scope of an assignment…. **Disclosure of all conflicts is required** even where we have employed other measures to manage the conflicts and those measures have mitigated the risk of any damage to a client's interests.

. . .

**Thus, our disclosure shall be in clear, fair and straight-forward language** and contain sufficient information to allow the client (and, if applicable, other parties to the transaction) to make an informed decision as to whether to proceed.

. . .

**Our real estate professionals are expected to escalate any questions regarding how to resolve conflicts to their managers, who may further escalate the matter to our geographic or line of business executives and ultimately to our senior executive officers.** Along the way, our Legal and Compliance Departments provide advice and counsel.

. . .

**Research**
*CBRE's research is objective and impartial.*

CBRE prepares and issues real estate market and investment research relied upon by many institutional real estate investors to allocate their resources and investments. As such, it is critical that all research produced by CBRE be objective, impartial, fair and not misleading. **CBRE has implemented policies and procedures to identify, disclose and manage conflicts of interest that may arise in the preparation and distribution of our research.**

. . .

**Escalation Procedures**
CBRE has established an effective escalation process for resolving conflicts and business selection issues… **Our real estate professionals are trained to escalate difficult conflicts issues to their managers.** Based on their training and knowledge of CBRE policy, our managers might escalate the issue to a more senior level of management or involve members of our Legal Department" (Ex. 22, pp. 2-5 and 10-11) (emphasis added).

39.     The first e-mail from Lisa Weinberg to Siegel (October 1, 2014, at 9:59 a.m.) (Ex. 26 — quoted above) that *mentions Pace* and requests comps

and market information for West Chelsea was a blatant warning of possible breaches of fiduciary duty and conflicts of interest. Siegel should have immediately informed Pace, in writing, along with his manager Kleinberg, of Lisa Weinberg's e-mail and request. Siegel and CBRE violated the First Agreement and breached their fiduciary duty to Pace by failing to solicit direction from Pace and CBRE as to what Siegel's response, if any, should be to Lisa Weinberg's first e-mail (Ex. 26). That breach and failure to disclose to Pace and CBRE violated New York law, the REBNY Code of Ethics, Paragraph II.A(2) and (6) (Ex. 20), CBRE's Business Conduct Rules (Ex. 21) and CBRE's Conflicts Rules (Ex. 22).

40.    Pursuant to the REBNY Code of Ethics (Ex. 20), CBRE's Business Conduct Rules (Ex. 21) and CBRE's Conflicts Rules (Ex. 22), by not revealing to Lisa Weinberg that CBRE was acting as Pace's exclusive broker under a contract with Pace, Siegel (and CBRE) were not dealing "honestly" with Weinberg. The ethical standard for Siegel was to respond to Lisa Weinberg's request by saying, e.g., "Lisa, I am representing Pace in its space search and cannot provide you with any market information without my client's consent. I will consult with my client and get back to you." It was a perfect, custom-made opportunity to inform Weinberg that CBRE was the exclusive broker for Pace and would be seeking a commission in any transaction that might ensue between Pace and Weinberg concerning the Premises.

41.    As demonstrated in Section A.30 above, Siegel had no fewer than 11 occasions between October 1, 2014 and October 17, 2014 to do the following:

      i.     Advise Pace that Weinberg was seeking comps and market information for West Chelsea where the Premises were located **before** responding to Lisa Weinberg;

      ii.    Seek written permission from Pace to transmit to Weinberg the West Chelsea comps, market information and a

comprehensive CoStar report **before** responding to Lisa Weinberg;

iii. Immediately advise Weinberg that CBRE was Pace's exclusive broker;

iv. Immediately advise Weinberg that CBRE would be seeking a commission in any transaction that might ensue between Pace and Weinberg concerning the Premises; and

v. Seek advice from his manager Kleinberg or from CBRE's legal department as to a response, if any, to Lisa Weinberg's several e-mails requesting comps, a CoStar report and market information, **before** responding to Lisa Weinberg's e-mails.

42. If the first e-mail from Lisa Weinberg to Siegel, dated October 1, 2014 at 9:59 a.m. (Ex. 26), was a blatant warning, the October 9, 2014 e-mail at 3:07 p.m. from Lisa Weinberg to Siegel (Ex. 35) was even more blatant. In that October 9, 2014 e-mail (Ex. 35), Lisa Weinberg specifically requested a CoStar report, comps and market information for "our [Weinberg's] future development" (Ex. 35). As Siegel well knew, Weinberg had only one property that was under future development, i.e., the New Building at the Premises (Ex. 12, 143:10-144:16). Siegel, a purported expert in the Chelsea commercial real estate market (Ex. 4, 28:12:17), also was well aware that Weinberg was *not* in the business of developing the buildings he owned and therefore "future development" only could have referred to Pace and the Premises. Lisa Weinberg's use of the term "future development" was in full accord with Pace seeking a new "ground up" construction to lease.

43.    Lisa Weinberg's October 9, 2014 e-mail at 3:07 p.m. to Siegel (Ex. 35)
       requested "specific info" from Siegel for Weinberg's "future development,"
       i.e., Weinberg's brand new construction for the Pace deal.  In that October
       9, 2014 e-mail (Ex. 35), Lisa Weinberg emphasized that she was
       requesting the CoStar report *solely* to gather relevant lease information for
       Weinberg's new ground up construction, which Siegel knew Weinberg
       planned to lease to Pace.  Lisa Weinberg was not seeking this *specific*
       information for any other purpose.

44.    Even if Siegel never expected a commission from Weinberg and never
       intended to represent Pace in a negotiation with Weinberg, he (and
       CBRE) owed a fiduciary duty to Pace.  Any information provided to Lisa
       Weinberg without permission from Pace was a breach of fiduciary duty
       and created a conflict of interest.

45.    Siegel failed to advise Pace or obtain Pace's consent ***prior*** to responding
       to Lisa Weinberg.  Kleinberg testified that Siegel ***orally*** advised Harnden
       of the e-mails, comps and CoStar report ***after*** the fact (Ex. 13, 88:3-17).
       There is no hard or other evidence whatsoever to support the allegation
       that Siegel advised Harnden that he was supplying critical market
       information to Weinberg.  After extensive questioning as to the breach,
       Brennan acknowledged that she would have advised Siegel "to discuss it
       with. . . client [Pace] ***first***" (Ex. 9, 80:7-16) (emphasis added).  Kleinberg
       testified that a broker may share comps with a landlord as part of a

"strategy **_with_** the client" (Ex. 13, 84:11-13) (emphasis added), indicating that the client would have to be informed in advance of the strategy.

46.    Siegel provided market "comps" to Weinberg. These "comps" are not readily available to an owner. Brokers share details of completed transactions discreetly amongst themselves and each company maintains a database with that information. A relatively small owner such as Weinberg does not maintain this type of database; it would take innumerable calls to many brokers to gather this information. It is likely that brokers would not share this information with a relative stranger. By sharing this proprietary information with Lisa Weinberg, Siegel provided non-public data, breaching his fiduciary duty to Pace. Brennan stated that she would not have approved of a broker representing a tenant providing comps to a landlord, acknowledging that a breach of fiduciary duty can have serious legal consequences (Ex. 9, 92:3-12; 275:9-23). It is well known in the real estate brokerage industry that when a broker breaches the fiduciary duty of undivided loyalty to his client, i.e., Pace, _the broker forfeits his rights to a commission_. Such a violation also could lead to disciplinary action or termination of the broker.

47.    Plaintiff provided a "CoStar report" to Lisa Weinberg. A CoStar report is an important tool for commercial brokers and landlords because, inter alia, it provides some comparative commercial rent prices for commercial buildings in the neighborhood of the landlord's property (Ex. 8, 55:22-57:2;

21

57:22-58:12). Most importantly, a CoStar report provided Weinberg with a view into potential alternatives, or lack of alternatives, for Pace, thus giving Weinberg a negotiating advantage in its lease negotiations with Pace. A CoStar report provides the landlord with critical information regarding the tenant's other options to lease vacant space in a neighborhood. By providing a CoStar report to Weinberg in breach of its fiduciary duty, CBRE put Pace in a weakened negotiating position with Weinberg by informing Weinberg as to Pace's limited options available in the neighborhood.

48.     It is undisputed that Defendants were seeking a new "ground up" building in the Chelsea area, which is the space Defendants ultimately leased in 2015 from Weinberg. Lisa Weinberg testified that the term "ground up" means "[n]ew construction, new development from the ground-up" (Ex. 8, 91:9-16) and that the phrase "future development" in her 10/9/14 e-mail (Ex. 35) means "[t]he Pace deal" (Ex. 8, 84:7-13), i.e., the leases between Pace and Weinberg in 2015. Lisa Weinberg zeroed in on the target, i.e., future development. The reference to "future development" meant that Lisa Weinberg asked Siegel to assist with and aid Weinberg's negotiations with CBRE's exclusive client which was Weinberg's proposed tenant, i.e., Pace.

49.     The CoStar report was not available to Weinberg because Weinberg does not pay for the required license to have access to this information. Siegel

22

(and CBRE) breached their fiduciary duty to Pace by supplying that CoStar report to Weinberg. Gathering that information herself would have been an arduous process, at best, for Lisa Weinberg. She would have had to identify every potential property and its owner and then attempt to reach each owner or agent. This could have taken months to complete.

50. Lisa Weinberg testified that the comps and CoStar report were helpful in Weinberg's negotiations with Pace concerning lease terms (Ex. 8, 55:22-57:2; 57:22-58:12). The mere contact between Siegel and his client Pace's counterparty in lease negotiations (Weinberg) and Siegel's provision of crucial real estate market information to that counterparty were breaches of fiduciary duty. Such breaches of fiduciary duty, in my experience and opinion, are fatal to any claim by CBRE for a commission. I can recall at least two prior situations I dealt with as a manager where the brokerage firm was compelled to forfeit commissions due to breaches of fiduciary duty by brokers. In both situations, the brokerage firms quickly acknowledged the breaches. In one situation, the brokerage firm required additional ethics training for one broker.

51. As a senior member of management, I conducted regular training sessions for brokerage professionals stressing the ethical obligations of real estate brokers. Of particular importance is the duty of undivided loyalty. Brokers were regularly advised that a breach of fiduciary duty meant a forfeiture of commission, possible termination of employment by

Case 1:17-cv-03452-ALC-SN Document 273 Filed 07/10/18 Page 28 of 43

the firm and possible loss of license. I arranged for these training sessions at numerous firms as a senior manager, and continue to do the same as a consultant. While at Cushman & Wakefield, I was named as the Conflict of Interest Officer in a contract with a major tenant. I was charged with ensuring that internal procedures were in place to protect against any breach of fiduciary duty and obligated the firm to conduct broker training once a year with respect to conflicts of interest. It was my duty to institute and enforce these procedures, which I did. All CBRE employees who were deposed (Brennan, Kleinberg, Siegel, Walker, Bergey and Kaye) testified that CBRE provides yearly training sessions, including, without limitation, online training, concerning the fiduciary duty owed between CBRE and its clients.

52.    CBRE's Conflicts Rules (Ex. 22, excerpted in paragraph 38 above) requires its brokers to seek guidance from managers, human resources, compliance or legal if they have an issue regarding conflicts of interest and/or breaches of fiduciary duty. Siegel either had not been trained on CBRE's standards or chose to ignore them. CBRE failed to supervise its associate broker Siegel and allowed him to act in a manner detrimental to Pace, breaching his and CBRE's fiduciary duty to Pace. Accordingly, it is my opinion that CBRE must forfeit any right it may claim to have had in this instance to any commission.

## B.  ISSUES AND OPINIONS RELATING TO FIRST AGREEMENT

### I.  CBRE DID NOT "FIND, NEGOTIATE AND SECURE PREMISES" (FIRST AGREEMENT, EX. 18, PARAGRAPH 1)

53.   Pursuant to the First Agreement (Ex. 18), which was drafted by CBRE, CBRE was obligated to "find, negotiate and secure premises" (paragraph 1).  There was to be an "agreed strategy" (Ex. 18, paragraph 2), which, as described in the Harnden Deposition (Ex. 5, 40:5-17), was to hire CBRE solely to find an **_alternative_** to new development or space to supplement new development.  Harnden testified that Pace "hired [Siegel] to find alternatives" (Ex. 5, 62:7-9) and that comps provided by Siegel were used for alternatives, not to negotiate with Weinberg (Ex. 5, 129:14-23; 184:4-14; 221:15-22).

54.   CBRE and Siegel did not perform the requisite services to have met the tests needed to earn a commission.  By his own admission at his deposition, Siegel acknowledged that he was not qualified to negotiate a lease for ground up construction by stating that he had never represented a tenant in that situation and was unfamiliar with the process (Ex. 4, 209:16-210:6).

### II.  CBRE WAS NOT THE PROCURING CAUSE

55.   CBRE was not the procuring cause of either lease transaction nor did it have any role in the chain of events that brought about a meeting of the minds between Weinberg and Pace.  CBRE's associate broker Siegel did not even attempt to add value, never requested a seat at the table, never requested or read the 2000 Lease (Ex. 38) between Weinberg and Pace (Ex. 4, 43:17-44:25) (something which usually would be expected as part of a brokerage service), never asked to see or assist with any lease

Case 1:17-cv-03452-ALC-SN Document 279-1 Filed 10/28/22 Page 30 of 44

proposals or financial analysis and clearly had no expectation of earning a commission unless he sourced a new location for Pace or Pace renewed its lease or took additional premises (Ex. 18, paragraph 3).

56. Several CBRE witnesses testified that CBRE never created an amicable atmosphere or chain of circumstances that led to an agreement or called Samuel Weinberg in an attempt to create an amicable atmosphere between Weinberg and Pace in terms of negotiating the lease (Ex. 4, 195:4-15; 200:13-23; Ex. 9, 251:3-19; Ex. 13, 182:18-184:7; 184:21-25; Ex. 10, 146:22-24).

57. It was clear that Siegel was not anticipating earning a commission in the New Building and, accordingly, chose not to add value to the ultimate or possible transaction and did not attempt to insert himself. A broker expecting a commission never would sit back and wait without looking to the landlord for the commission! In my over 20 years of broker management, I have never seen a broker **_not_** act aggressively to be a part of a transaction if he had an expectation of earning a commission.

III. **PACE DID NOT RENEW ITS LEASE OR TAKE ADDITIONAL PREMISES AT 534 WEST 25TH STREET (FIRST AGREEMENT, EX. 18, PARAGRAPH 3)**

58. Pursuant to Paragraph 3, the First Agreement (Ex. 18) provides, in pertinent part, the following:

"Notwithstanding the foregoing, if [sic] the event that you decide to renew your lease or take additional premises at 534 West 25th Street and your landlord refuses to make an agreement to pay us a full market commission, you will pay us a full market commission when the transaction is consummated."

59. It is clear that, except for the Short-Term Lease (Ex. 24), Pace did not renew its lease. Instead, it entered into a brand new long-term lease(s) with Weinberg for the New Building. Pace did not take additional premises at 534 West 25th Street either. Rather, it agreed to occupy a

new ground-up construction at 534 West 25th Street.  In the real estate business, new ground-up construction is not deemed the taking of "additional premises."  A tenant takes "additional premises" by remaining in place in its current (possibly expanded) location under a renewal lease.

60.     The First Agreement (Ex. 18)—drafted by CBRE—was not complete, clear and unambiguous and must be construed against CBRE.  Walker testified that CBRE's reference to "additional premises" in Paragraph 3 was "not clear" and that "it would have helped" if CBRE had referenced ground-up construction in Paragraph 3 (Ex. 10, 140:2-15).

61.     In Paragraph 3, if CBRE's intent were to include payment of a commission for a new lease in the New Building, why didn't CBRE state that, when it drafted this language?  CBRE added that sentence and should have been clear as to its intent.  The First Agreement (Ex. 18) is a CBRE template (Ex. 13, 44:2-22).  As a manager, if a broker under my supervision intended to be protected for a commission under similar circumstances, I would make certain that the language was specific.  Either CBRE never expected to be paid a commission if a new lease was completed in the New Building or CBRE was intentionally misleading Pace as to the meaning of that sentence, knowing that Pace would not have agreed if it included specific coverage for the New Building.

## IV.   THE FIRST AGREEMENT (EX. 18) PROVIDED THAT CBRE MUST, IN THE FIRST INSTANCE, SEEK ITS ALLEGED COMMISSION FROM THE LANDLORD, WHICH CBRE DID NOT DO

62.     Paragraph Three of the First Agreement (Ex. 18) provides, in pertinent part, that CBRE must first look to the landlord for its alleged commission, as follows:

> "3.  ***CBRE agrees to look to the owner or lessor for our commissions,***… Notwithstanding the foregoing, if [sic] the event that you decide to renew  your lease or take additional premises at 534 West 25th Street ***and your landlord refuses to make an***

*agreement to pay us a full market commission*, you will pay us a full market commission when the transaction is consummated" (Ex. 18, paragraph 3) (emphasis added).

63.    Even if "additional premises" (Ex. 18, paragraph 3) were intended to cover space leased in the New Building (which is not the case), CBRE was obligated to "look to the owner [Weinberg] or lessor [Weinberg] for our commissions" (Ex. 18, paragraph 3). Siegel testified in his deposition that he never called Weinberg to request a commission because Siegel's managers and CBRE's legal department directed him not to do so (Ex. 4, 138:12-140-2). Therefore, Siegel was directed to breach the First Agreement (Ex. 18) and Second Agreement (Ex. 19) that expressly required the broker to **look to the landlord (Weinberg)**, in the first instance, for CBRE's commission. The First Agreement (Ex. 18) and Second Agreement (Ex. 19) were both drafted exclusively by CBRE. Any ambiguity must be held solely against CBRE.

64.    It is unheard of in the brokerage industry to have a manager or legal department instruct the broker not to call the landlord or owner to request a commission. The complete opposite is the industry standard. As the usual expectation is to receive payment from the landlord, a broker must ask the landlord for that payment. Kim Brennan ("Brennan"), testifying on behalf of CBRE, testified that in 29 years she does not know of a single situation where a legal department at a brokerage firm advised a broker not to seek a commission from an owner (Ex. 9, 48:14-20). Brennan further acknowledged that she thought that it was unusual or odd that Siegel did not look to the landlord for a commission (Ex. 9, 69:16-19).

65.    Siegel failed to look to the landlord at any point to collect a commission, which might have resulted in Weinberg negotiating and paying CBRE a commission, albeit perhaps a reduced one since commercial real estate commissions are negotiable (Ex. 9, 132:9-10). Siegel also admitted that neither he nor CBRE performed under the First Agreement (Ex. 4, 200:13-

28

23; Ex. 18). Brennan, Kleinberg and Walker testified that CBRE never created an amicable atmosphere or chain of circumstances that led to an agreement between Weinberg and Pace in terms of negotiating the lease (Ex. 9, 251:3-19; Ex. 13, 182:18-184:7; 184:21-25; Ex. 10, 146:22-24).

## V. THE CLAUSE "FULL MARKET COMMISSION" IS NOT DEFINED (FIRST AGREEMENT, EX. 18, PARAGRAPH 3)

66.    Paragraph Three of the First Agreement (Ex. 18) provides, in pertinent part:

> "…and your landlord refuses to make an agreement to pay us a full market commission, you will pay us a full market commission when the transaction is consummated" (Ex. 18, paragraph 3).

67.    The inclusion in paragraph 3 of the First Agreement (Ex. 18) of the phrase "a full market commission" does not reflect a clear contractual obligation and is not a commonly used phrase (Ex. 13, 24:4-19; 25:8-26:10; 265:10-15; Ex. 4, 150:4-9). Brennan was unable to state whether anyone, particularly a tenant, can define "full market commission" (Ex. 9, 114:22-116:7; 119:24-120:11). Pace was not in a position to understand the meaning of "full market commission." It is not a phrase that has meaning in the brokerage industry. There is no such thing as "full market commission" as each brokerage firm has its own rates and schedules of commissions. At least 30 years ago, "market" percentages for commissions were no longer used as they were deemed price fixing. REBNY used to publish rates; now, each company establishes its own rates. Landlords sometimes negotiate and pay reduced commissions since commercial real estate commissions are negotiable (Ex. 9, 132:9-10).

68.    If CBRE wanted Pace to understand what it was seeking, CBRE should have disclosed the meaning of a full market commission under CBRE's

rate schedule in a complete and "easy to understand" manner and the formula on which expected compensation would be derived as dictated by CBRE's Conflicts Rules (Ex. 22, pp. 5-6, discussed below). CBRE should have attached its schedule and a sample calculation. Without a schedule, the tenant (Pace) would not have any indication of a possible contractual obligation and the magnitude of that obligation. The First Agreement (Ex. 18) is incomplete as a material term is absent. Schedules are not generally attached to tenant representation agreements because commissions are paid only by landlords, but, as in this instance, where an attempt was made to shift the burden to Pace under a very limited circumstance, the schedule should have been attached.

69. CBRE's Conflicts Rules states (Ex. 22 pp. 5-6):

> *"We believe our clients are entitled to understand fully the nature, amount and timing of compensation that CBRE anticipates receiving for our services*, even when it is contingent or not entirely paid directly by our client (e.g., a tenant representation brokerage commission paid by the landlord). *Thus, our explanation of the compensation we anticipate should be complete and easy to understand. Where an amount is not possible to calculate at the outset of an assignment, we will share the formula on which expected compensation will be derived"* (emphasis added) (Ex. 22 pp. 5-6).

CBRE's Conflicts Rules (Ex. 22) contains obligations that CBRE imposes on its brokers. These rules are an implied, if not express, part of every contract that a client signs with CBRE and the client should be able to fully rely on these rules.

70. Neither Siegel nor anyone else at CBRE ever provided to Pace an explanation of the term "full market commission." Brennan could not provide any procedure in place at CBRE to fulfill what it promises in CBRE's Conflicts Rules (Ex. 22; Ex. 9, 109:11-114-6).

## VI.    CBRE RETALIATED AGAINST PACE

71.    Under the First Agreement (Ex. 18), CBRE did not perform services rising
to the level of earning a commission with respect to either the First Lease
(Ex. 23) or Second Lease (Ex. 25), did not look to Weinberg for a
commission as required, did not intend to include the leasing by Pace of
the New Building and did not include a schedule or explanation of
commission rates.  The right to any payment of commission from Pace to
CBRE fails for all of these reasons.  The First Agreement (Ex. 18) is not
typical of the clear enforceable agreements that I have approved and
supervised over many years.

72.    As further evidence of its own understanding that it was not entitled to a
commission if Pace entered into a new lease with Weinberg in the New
Building, CBRE failed to request a commission from anyone when the
First Lease (Ex. 23) was executed as of March 6, 2015.  CBRE still
believed that it would represent Pace in a lease for back office space.

73.    It was not until the Second Lease (Ex. 25) was executed as of June 11,
2015 and Siegel realized that CBRE was not earning any commission that
Siegel demanded that Pace pay.  CBRE had ample opportunity to seek
commission protection from Weinberg during the year Pace was
negotiating with Weinberg or after the First Lease (Ex. 23) was executed.
CBRE did not make any demand because it never expected to be paid.
CBRE suddenly sought a commission when it realized that the Second
Lease (Ex. 25) execution meant that there was no transaction involving
CBRE and, thus, no commission (Ex. 13, 186:4-7—"I am very clear that if
the other transactions happened, great, because the last thing we wanted
to do is go to Pace and sue them for commission;" see also Ex. 55 p. 2).
Only after that point did CBRE decide to stop putting litigation against

Pace "on hold" (Ex. 13, 109:8-10). Even then, CBRE never looked to or asked Weinberg for a commission.

VII. **THERE IS NO EVIDENCE THAT CBRE DELIVERED THE FULLY EXECUTED FIRST AGREEMENT (EX. 18), AS REQUIRED BY THE FIRST AGREEMENT (EX. 18, PARAGRAPH 6)**

74.   Paragraph 6 of the First Agreement (Ex. 18) provides, in pertinent part, that:

> "Signatures may be exchanged by hand, by mail, by fax, by e-mail, or in counterparts - - any such method being binding on both sides when completed and exchanged" (Ex. 18, paragraph 6).

75.   The foregoing delivery clause in paragraph 6 is in accord with 19 NYCRR § 175.12, titled "Delivering copy of instrument" (Ex. 15), and provides the following:

> "**A real estate broker shall immediately deliver a copy of any instrument to any party or parties executing the same, where such instrument has been prepared by such broker or under his supervision** and where such instrument relates to the employment of the broker or to any matters pertaining to the consummation of a lease, or the purchase, sale or exchange of real property or any other type of real estate transaction in which he may participate as a broker" (emphasis added).

76.   There is no evidence that Siegel "immediately" or promptly delivered a copy of the fully signed First Agreement (Ex. 18) to Pace, pursuant to 19 NYCRR § 175.12 (Ex. 15). Siegel testified that that he did not e-mail the fully signed First Agreement (Ex. 18) to Pace (Ex. 4, 111:11-16; 114:1-11; 114:22-115:2). There is no evidence that Siegel mailed the fully signed First Agreement (Ex. 18) to Pace and Pace denies that it ever received the fully signed First Agreement (Ex. 18) by any method (Ex. 4, 115:6-10; 117:2-22; 126:8-15; Ex. 5, 123:23-124:3). Siegel testified that he could not remember when he allegedly mailed the fully signed First Agreement (Ex. 18) to Pace and that it could have been up to three months before he

allegedly mailed it to Pace (Ex. 4, 117:2-22), which, if taken as true, certainly would be violative of the statute.

## VIII. THE FIRST AGREEMENT (EX. 18, PARAGRAPH 4) CONTAINS A PROHIBITED AUTOMATIC RENEWAL CLAUSE

77.    Paragraph 4 of the First Agreement (Ex. 18) contains an automatic renewal clause, as confirmed by CBRE's legal department, as follows:

> "This agreement shall commence on the date hereof and shall continue for a period of twelve (12) months. Thereafter, this agreement shall continue until terminated by either party on thirty (30) days prior written notice or until the assignment contemplated herein is completed" (Ex. 18, paragraph 4).

78.    An automatic renewal clause is barred by 19 NYCRR §175.15 (Ex. 15) and possibly voids the First Agreement (Ex. 18).  See also "Automatic Renewal Clauses in Exclusive Listing Agreements" by Charles Botensten and notation by Neil B. Garfinkel, attached as Ex. 16).  This clause is further evidence of the carelessly drafted aspects of the First Agreement (Ex. 18).  If the First Agreement (Ex. 18) had expired on March 17, 2015 without any automatic renewal, Pace would have been aware of any claim to a commission by CBRE, as industry custom and practice dictates that upon the termination of a real estate broker's contract with a client, the broker provides the client with a post- termination coverage list.  This list informs the client about the specific properties for which the broker would be owed a commission in the event the client were to enter into a transaction concerning any of those properties and negotiations had commenced prior to the expiration of the contract term.  The automatic renewal deprived Pace of that post-termination coverage list.

## IX. CBRE ADDED DE MINIMIS VALUE

79.    Most of the larger brokerage companies, including CBRE, have a policy of encouraging their brokers to obtain a written commission agreement.

CBRE failed to do so in this instance because CBRE knew that it added the bare minimum of value to Pace's transaction with Weinberg.

80. CBRE has some of the foremost consulting capabilities in the industry with a very sophisticated financial analysis and modeling department ("CBRE's Consulting Group"). The individuals in CBRE's Consulting Group have the expertise and knowledge to fully analyze lease documents and provide top-of-the-line advice and guidance concerning financial impacts, such as tax and operating clauses, net effective rents, gross vs. net lease analysis, buy vs. lease analysis and other critical lease and occupancy issues.

81. CBRE committed a clear dereliction of duty, to the detriment of Pace, by failing to:

    i.     Ask for a copy of the 2000 Lease (Ex. 38);

    ii.    Analyze the 2000 Lease (Ex. 38);

    iii.   Request proposed term sheets or other relevant documents concerning lease negotiations between Pace and Weinberg; or

    iv.   Recommend to Pace that CBRE bring in CBRE's Consulting Group (Ex. 4, 43:17-44:14).

It is possible that Siegel did not want to share a commission with CBRE's Consulting Group and so never sought their input.

82. Although Siegel tried to excuse his inaction by claiming that Pace did not want Siegel to communicate with Weinberg, Siegel testified that Harnden "didn't specifically say don't call" Weinberg and that Harnden "didn't direct [Siegel] not to call" Weinberg (Ex. 4, 151:18-21). Even if Siegel were directed not to communicate with Weinberg—which he was not—Siegel still could have provided significant added value to Pace by recommending that Pace utilize CBRE's Consulting Group who, in the

ordinary course of business, help clients secure the best lease terms possible.

## C. ISSUES AND OPINIONS RELATING TO SECOND AGREEMENT

83.  The Second Agreement (Ex. 19), on its face, appears to be an agreement for the subletting of Pace's space at 32 East 57th Street. Indicative of its continuing careless document production and lack of professionalism on Siegel's part, CBRE purposely (later claiming a mistake) included the acquisition of new space in the Second Agreement (Ex. 10, 63:9-64:2; 223:10-15; Ex. 13, 114:13-22). CBRE's carelessness extends to the SAC (Ex. 2). In the SAC (Ex. 2, paragraph 47), CBRE alleged that Pace breached the Second Agreement (Ex. 19); however, CBRE has conceded that this was a mistake and that CBRE is suing based on a purported breach of the First Agreement (Ex. 18; Ex. 9, 153:18-154:3; Ex. 13, 166:25-167:7). Brennan testified that she did not know how Pace allegedly breached the Second Agreement (Ex. 19; Ex. 9, 154:5-19; 156:13-18).

84.  The Second Agreement (Ex. 19) is a standard one and CBRE did not add any of the renewal or expansion language it used in the First Agreement (Ex. 18). CBRE appended to the Second Agreement (Ex. 19) a sublease commission schedule, which is relevant only to Paragraph A of the Second Agreement (Ex. 19). CBRE did not append a commission schedule concerning the acquisition of space (Paragraph B of the Second Agreement (Ex. 19)), which is consistent with CBRE's failure to append such schedule to the First Agreement (Ex. 18; Ex. 10, 78:23-79:12).

85.  Paragraph C.5(ii) of the Second Agreement (Ex. 19) provides that it supersedes all prior agreements, thus cancelling out the First Agreement (Ex. 18) (and any potential obligations for Pace to pay any commissions as a tenant under that agreement) (Ex. 13, 114:6-11).

86.   The Second Agreement's (Ex. 19) superseding language is critical
      because in Paragraph B.2, CBRE agreed to look to the owner or lessor for
      any commissions, which "require[d] or obligate[d] CBRE to first go to the
      owner to get its commissions" (Ex. 10, 144:3-9).  CBRE failed to look to or
      communicate with Weinberg to obtain a commission.

87.   It is my opinion that, as with the First Agreement (Ex. 18), CBRE did not
      perform tenant representation services under the Second Agreement (Ex.
      19), did not expect to receive a commission from Pace (or Weinberg) for a
      new lease in the New Building or for any Pace lease other than a sublet
      lease and agreed to look to the landlord, not Pace, for any commission.

88.   It should be further noted that the same person, Elaine Kleinberg—
      Siegel's broker manager and a practicing attorney—signed both the First
      Agreement (Ex. 18) and Second Agreement (Ex. 19).  If she kept a record
      of agreements that she executed, she should have been aware of the
      conflicting provisions of the two agreements and the fact that the Second
      Agreement (Ex. 19) cancelled the First Agreement (Ex. 18).  Managers
      should document and understand all agreements that they approve and
      execute for brokers on behalf of the company.  In any event, the First
      Agreement (Ex. 18) and Second Agreement (Ex. 19), drafted by CBRE,
      should be construed against CBRE.

D.    **ISSUES AND OPINIONS CONCERNING CBRE'S PRACTICE OF
      DESIGNATING CORPORATE TITLES TO ITS ASSOCIATE BROKERS
      AND SALESPERSONS**

89.   On April 26, 2013 and on August 20, 2013, the New York Department of
      State, Division of Licensing Services ("DOS") issued two opinions ("DOS
      Opinions," Exs. 39-40) reaffirming the prohibition that a real estate
      brokerage company (such as CBRE) may not provide corporate titles to
      salespersons or associate brokers for marketing or other purposes and
      that salespersons and associate brokers are similarly prohibited from

falsely advertising that they hold such a position within the brokerage company. Corporate brokers, also known as representative brokers, may hold corporate titles and advertise that they hold such titles only if they are responsible for the supervision, management and conduct of a real estate brokerage business ("Corporate Authority").

90.   The DOS referenced, inter alia, the following statutes and regulations as legal support for its opinions: Real Property Law ("RPL") §§ 441-C(1)(a), 441-B(2), 440(2), 19 NYCRR Art. 175 and 19 NYCRR § 175.22.

91.   In an August 27, 2013 REBNY Bulletin (Ex. 41), Neil B. Garfinkel ("Garfinkel"), REBNY Broker Counsel, explained that "in order to hold a corporate title, a person must be the 'representative broker' of a real estate brokerage company...A Representative Broker is a real estate broker who is responsible for the conduct and management of a real estate brokerage company" (Ex. 41).

92.   In a March 23, 2017 Memorandum (Ex. 42), Garfinkel instructed REBNY members that the Department of State has prohibited real estate brokers from providing Associated Licensees with corporate titles such as "President," "Vice President," "Senior Vice President," "Executive Vice President" or "Managing Director."

93.   CBRE continually violates the law by permitting its salespersons and associate brokers, as well as corporate brokers lacking Corporate Authority, to maintain corporate titles in their signature blocks and by advertising on its website that such individuals use corporate titles. At the time of the events underpinning this litigation, CBRE was in violation of the DOS Opinions (Exs. 39-40). Subsequently, CBRE instituted an elaborate mechanism to permit associate brokers to use corporate officer titles by designating these individuals as corporate brokers (Ex. 13, 288:20-289:20) despite the fact that these individuals do not have any of the

Corporate Authority of an officer or a manager—in direct contravention of the foregoing DOS authority.

94.   Siegel's signature block on his emails states that Siegel is a Senior Vice President of CBRE (Ex. 43).  On CBRE's website, CBRE describes Siegel as a Senior Vice President (Ex. 44).  At the time of the events underpinning this litigation, Siegel was an associate licensed real estate broker.  Siegel now is a licensed corporate broker in the State of New York (Ex. 45).

95.   Walker's signature block on his e-mails states that Walker is a First Vice President of CBRE (Ex. 46).  On CBRE's website, CBRE describes Walker as a First Vice President (Ex. 47).  At the time of the events underpinning this litigation, Walker was an associate licensed real estate broker.  Walker now is a licensed corporate broker in the State of New York (Ex. 48).

96.   Bergey's signature block on his e-mails states that Bergey is a First Vice President of CBRE (Ex. 49).  On CBRE's website, CBRE describes Bergey as a First Vice President – Honorary Title (Ex. 50).  Bergey is licensed as a real estate Salesperson in the State of New York (Ex. 51).

97.   Kaye's signature block on his e-mails states that Kaye is an Associate of CBRE (Ex. 52).  On CBRE's website, CBRE describes Kaye as a Senior Associate, but misrepresents that Kaye is a licensed real estate broker (Ex. 53) despite the fact that Kaye is licensed as a Salesperson in the State of New York (Ex. 54).

## CONCLUSIONS

98.    In my opinion:

   i.    CBRE breached its fiduciary duty to its exclusive client Pace on multiple occasions by:

   a.    Sending comps, a Costar report and market conditions to Lisa Weinberg without Pace's ***prior*** oral or written consent;

   b.    Sending comps, a Costar report and market conditions to Lisa Weinberg without CBRE's ***prior*** oral or written consent; and

   c.    Assisting Pace's counterparty in lease negotiations (Weinberg) and thereby weakening Pace's bargaining power;

   ii.    CBRE breached the REBNY Code of Ethics (Ex. 20), CBRE's Business Conduct Rules (Ex. 21) and CBRE's Conflicts Rules (Ex. 22);

   iii.    Except for the Short-Term Lease (Ex. 24), Pace did not renew its lease or take additional premises;

   iv.    CBRE did not find, negotiate or secure the New Building;

   v.    CBRE's use of corporate titles for its brokers and employees violated RPL §§ 441-C(1)(a) (Ex. 14), 441(1)(b) (Ex. 14), 19 NYCRR § 175.22 (Ex. 15) and two New York State Department of State Opinions, dated April 26, 2013 (Ex. 39) and August 20, 2013 (Ex. 40);

   vi.    CBRE's use of an automatic renewal provision in the First Agreement violated 19 NYCRR §175.15 (Ex. 15);

   vii.    CBRE was not the procuring cause and added de minimis value to the lease transaction(s);

   viii.    CBRE did not immediately return the fully executed First Agreement (Ex. 18) to Pace, as required by 19 NYCRR §175.12 (Ex. 15);

   ix.    There is no definition whatsoever of the term "full market commission" in the First Agreement (Ex. 18); and

      x.     CBRE made no efforts whatsoever to contact the landlord, despite multiple opportunities to do so.

99.    In my years of experience in the foregoing areas, I have advised many brokers and certainly would have advised CBRE's associate broker Siegel of his indefensible actions.  Additionally, sloppy management supervision and document production led to two agreements seemingly in conflict with each other (the Second Agreement (Ex. 19) supersedes the First Agreement (Ex. 18)) and the numerous breaches by Siegel and CBRE that should have been discovered and discontinued.

I reserve the right to supplement or amend this report as may be necessary, should any additional discovery or other evidence be brought to my attention.  I also reserve the right to offer opinions which are not specifically set forth in this report, but are logically related to or extend from these opinions which I have offered in this report.

Dated:  July 10, 2019

_Suzy A. Reingold_

Suzy A. Reingold