# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X   Case No. 17-cv-02452 (ALC) (SN)
CBRE, INC.,

                Plaintiff    **DECLARATION OF**
   -against-    **SUZY A. REINGOLD**

THE PACE GALLERY OF NEW YORK, INC. AND
THE PACE GALLERY LLC, D/B/A PACE GALLERY,

                Defendants.
------------------------------------------------------------------X

    SUZY A. REINGOLD hereby declares as follows:

1. I am Defendants' designated expert in this action. I am advised that my Expert Report, dated May 26, 2019 ("Expert Report"), and my deposition transcript, dated September 12, 2019, are, respectively, Exhibits 57 and 50.[1]

2. I have reviewed the Declaration of Stuart Siegel ("Siegel"), dated July 7, 2020 ("Siegel Decl."). The Siegel Decl., containing new evidence from Plaintiff's principal broker in this action, was submitted long after I was deposed and submitted my Expert Report and Rebuttal Expert Report, dated August 14, 2019 ("Rebuttal Expert Report").

3. Plaintiff alleges that Defendants were its ***exclusive*** client. Plaintiff was aware that Defendants were directly negotiating lease terms with its landlord Weinberg. Weinberg ***initiated*** communications with Plaintiff and sought market information from Plaintiff to use against Defendants. Any suggestion that Weinberg would not use Plaintiff's market information against Defendants is wrong. Siegel admits that, at all times, he was aware that Weinberg "was very aggressive with respect to lease terms, particularly rents…" (Siegel Decl. ¶ 7). That type of landlord is not going to be educated by a tenant's broker. Any responsible broker would have

---

[1] I am further advised that Exhibits 4-13 and 17-38 to my Expert Report are Defendants' Exhibits 4-13 and 17-38 and, accordingly, my Expert Report (Ex. 57) has the remaining Exhibits 1-3, 14-16 and 39-56 thereto attached to Ex. 57.

immediately contacted the client to create an agreed strategy (and coordinate with the client's own negotiations with the landlord) so that any information that the broker may provide to the landlord—with the client's prior knowledge and consent—would further the client's interests. This was especially critical as Weinberg was unaware at the time that Plaintiff was the alleged exclusive broker for Defendants. Following Siegel's receipt of the initial October 1, 2014 e-mail from Weinberg (Ex. 26), which explicitly mentioned Plaintiff's client (Defendants) and sought market information, it was incumbent upon Siegel, as Defendants' fiduciary, to promptly contact Defendants to discuss and coordinate.

4. The key is that Siegel communicated with and emailed the 13 comps and the comprehensive 36-page CoStar Report for the entire Chelsea neighborhood ("Counterparty Information") to Weinberg ***without***:

(i)  Seeking Defendant's consent;

(ii)  Obtaining Defendant's consent;

(iii)  Providing Defendants with a copy of the exact contents of the communications, comps and CoStar Report; and

(iv)  Reporting the foregoing to his Broker Manager Elaine Kleinberg.

Siegel's conduct runs counter to the REBNY Code of Ethics (Ex. 20) and the fiduciary duty and conflict of interest principles promulgated in Plaintiff's Business Conduct Rules (Ex. 21) and Conflicts Rules (Ex. 22) concerning communications with a counterparty (Ex. 57 ¶¶ 31-41). CBRE's Business Conduct Rules (Ex. 21, pp. 18-19), inter alia, provide that Plaintiff owes fiduciary duties to its clients and that "[a] ***fiduciary duty is the highest standard of duty under the law***" and require Plaintiff's brokers to "***place that [client's] interests above our own***," "to act with due care" and to "***disclose*** conflicts of interest." (Ex. 21, pp. 18-19).

2

5. Siegel's statement that when "parties to a potential real estate transaction have known each other for many years, it is not uncommon for them to handle direct negotiations themselves, **with the broker working in the background**" (Siegel Decl. ¶ 9) (emphasis supplied), is bizarre. Siegel was not working in the "background." Siegel directly engaged in the foregoing without copying or forwarding to Defendants, Siegel's alleged exclusive client. Under anyone's interpretation, Siegel definitively was **not** working in the "background."

6. Siegel claims that he allegedly advised Defendants to seek from Weinberg a lower percentage increase from 5% to 3% for a 20-year lease and was "instrumental in achieving that reduction" (Siegel Decl. ¶ 22). Plaintiff provides no evidence whatsoever that Defendants acted upon Siegel's alleged advice.

7. Based on Siegel's Declaration, he performed a gross disservice to Defendants. The industry standard for rent increases over the term of a commercial lease of 20 years usually is not seen annually or as a percentage of rent, but is a fixed dollar amount, generally implemented at 5 year intervals, and certainly would not effectively be more than 1% annually for a lease of this size. Siegel's Declaration (Siegel Decl. ¶ 22) alleges that a 3% **compounded** increase of the yearly rental payments, plus a standard tax and operating expense escalation provision, were benefits to the Defendants. That is wrong. The compounding of rent at a yearly 3% rate increase in a large lease for 20 years is unheard of in the industry. A commercial lease usually provides for (1) a periodic fixed dollar amount of rent increase and (2) an annual increase in actual operating expenses and taxes. A 3% annual compounded rent increase might be found in a shorter term and smaller lease in an older building and not a new one, and would be paid by the tenant in lieu of annual actual increases in operating expenses and

taxes, not in addition to those.

8. Siegel's alleged advice caused an over $60,000,000.00 increase in the yearly compounded rental, tax and operating expenses that Defendants are obligated to pay Weinberg over the 20-year lease term.  Respectfully, Siegel's breaches of fiduciary duties and negligence should come as no surprise to the Court, as by his own admission at his deposition, Siegel was not qualified to negotiate a lease for ground-up construction, testifying that he had never represented a tenant in that situation and was unfamiliar with the process (Ex. 57 ¶ 54; Ex. 4, 209:16-210:6).

9. The increase percentage negotiations should have started at 0.5% and ended at no more than a 1% increase.  The foregoing underscores my statements in the Expert Report (Ex. 57 ¶ 57) and Expert Rebuttal Report (Ex. 70 ¶ 12) that Plaintiff did not perform, or even offer to perform, any of Plaintiff's vast array of tenant representation services, including, inter alia, using Plaintiff's sophisticated Advisory and Transaction Services department which includes without limitation Plaintiff's Financial Consulting department (see Plaintiff's website at https://www.cbre.com/real-estate-services/occupier/advisory-and-transaction-services), to analyze the proposed lease documents and provide guidance concerning critical financial impacts for Defendants.  See also 56.1 ¶ 326[2] and the multiple record references therein concerning, inter alia, the tenant representation services that Plaintiff should have used, but failed to use. Plaintiff's Financial Consulting departments would have recognized that a 3% or 3.5% increase ***far exceeds*** the customary and appropriate increase for a 20-year commercial lease and that a ***compounded*** 3% yearly increase is outrageous.

---

[2] "56.1" means Defendants' FRCP Rule 56.1 Statement, dated May 26, 2020.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of August, 2020 in New York, New York.

SUZY A. REINGOLD