**UNITED STATES DISTRICT COURT**
<u>**SOUTHERN DISTRICT OF NEW YORK**</u>

|  |  |  |
|---|---|---|
| CBRE, INC., | : | |
| Plaintiff, | : | |
| -against- | : | Case No.: 1:17-cv-02452-ALC-SN |
| | : | |
| THE PACE GALLERY OF NEW YORK, INC. AND THE PACE GALLERY, LLC, D/B/A PACE GALLERY, | : | |
| Defendants. | : | |
| ------------------------------------------------------------------ | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
<u>**DEFENDANTS' MOTION *IN LIMINE***</u>

**GREENBERG TRAURIG, LLP**
1840 Century Park East, Suite 1900
Los Angeles, California 90067

**GREENBERG TRAURIG, LLP**
One Vanderbilt Avenue
New York, New York 10017

**GREENBERG TRAURIG, LLP**
1 North Lexington Avenue, Suite 800
White Plains, New York 10601

## PRELIMINARY STATEMENT[1]

Pace's motion *in limine* contains an improper and meritless request to bifurcate this case into a liability phase and a damages phase. The request for bifurcation is not an evidentiary motion but rather an untimely substantive motion. Consistent with its pattern in this case, Pace never met and conferred about its motion to bifurcate and never previewed it in the Joint Pre-Trial Order or the meet and confer process leading to the joint submission. Moreover, Pace's position on bifurcation is diametrically opposite of what it told this Court just weeks ago, when the Court considered CBRE's motion to have a jury decide legal claims and the Court decide equitable claims (a motion made on an earlier court-ordered briefing schedule). At the time, Pace argued that "[b]ifurcation is 'the exception rather than the rule' and cannot be granted absent 'exceptional instances' and 'special and persuasive reasons,'" and that bifurcation should be denied.[2] Now Pace contends that this is the exceptional case after all and that it should be tried in a bifurcated manner.

In addition to the procedural defects in the motion, bifurcation of liability and damages is improper here and will needlessly extend the trial, interfere with a logical presentation of evidence, and inconvenience witnesses. The damages issues are inextricably intertwined with liability issues, the same witnesses will testify on both sets of issues, and what should be a short trial will be needlessly extended and witnesses will be inconvenienced if this case is carved up in two phases. Evidence about damages should be presented in "one trial in front of the jury," as ordered by this

---

[1] Unless otherwise stated, all capitalized terms herein have the same meaning as in the Joint Pre-Trial Order. (Joint Pre-Trial Order ("JPTO"), ECF No. 241.)

[2] Def. Mem. of Law in Opp. to Plt. Appl. for Bifurcation ("Pace Bifurcation Opp.") 2, ECF No. 253 (quoting *Monaghan v. SZS 33 Assocs., L.P.*, 827 F. Supp. 233, 245 (S.D.N.Y. 1993) and *Lewis v. Triborough Bridge & Tunnel Auth.*, No. 97-cv-0607 (PKL), 2000 WL 423517, at *2 (S.D.N.Y. Apr. 19, 2000)).

Court and agreed by the parties at the conclusion of the October 27 hearing. (Oct. 27 Hr'g Tr. 30:23-24, ECF No. 281.)

To the extent Pace seeks to exclude evidence that Stuart Siegel's provision of limited, commonplace market information to Pace's landlord, Wenat, was intended to and did benefit Pace, the motion should be denied on the merits. It is based on a tortured and grossly overbroad interpretation of the "faithless servant" doctrine. Whatever standard the Court ultimately applies on the "faithless servant" defense, Pace must prove that CBRE was acting contrary to Pace's interests in sharing market information—acting, in a word, *disloyally*. In response, CBRE must be permitted to explain that it was not disloyal and that it provided widely available market information without commentary to assist its client, Pace, by anchoring the landlord in market pricing rather than the unrealistically high rental rates it was trying to foist on Pace. To do so, CBRE must be permitted to explain that the comparable market information it provided showed Wenat that the property it wanted to rent to Pace was worth substantially less than it wanted (and nevertheless sought and obtained) from Pace on its new "wow" space. CBRE also is entitled to explain that it provided that information to assist its client, Pace, by demonstrating other options Pace had to rent space at far more attractive rental rates. Put simply, any rational purchaser/renter would want its broker to try to convince a seller/landlord that it needs to price the property in a reasonable manner or its client will go elsewhere. Presumably, that is why Pace thanked CBRE for doing so and used that information itself in at least negotiating down Wenat's asking price.

The challenged evidence about the benefit to Pace also is of central relevance to numerous other claims and defenses. Pace asserts two counterclaims that squarely raise the issue of CBRE's subjective good faith and good intentions: breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing. On both counterclaims, Pace seeks compensatory damages

caused by Siegel's provision of market information to Wenat. The fact that it was Siegel's intention to benefit Pace through these acts (and that Pace ultimately benefitted) squarely refute both claims. Indeed, providing that information was part of CBRE's performance of the contract: CBRE shared the information *to support Pace* in its lease negotiations with Wenat, and Pace's COO thanked Siegel for doing it.

Pace's motion should be denied in its entirety.

# I.    BIFURCATION SHOULD BE DENIED.

## A.    Pace's Bifurcation Application Is Untimely.

Pace's application to bifurcate the trial into liability and damages phases comes far too late.[3] Bifurcation was *just litigated* in this case. Months before the trial, CBRE notified the Court and Pace that it intended to seek bifurcation of equitable and legal issues. (JPTO 26.) CBRE's application was briefed and decided in an orderly way based on a Court-ordered briefing schedule well in advance of trial. Specifically, CBRE filed its motion in July 2022, and Pace opposed in August 2022.[4] Less than three weeks ago, the Court denied the application from the bench, ruling that there would be "one trial in front of the jury." (Oct. 27 Hr'g Tr. 30:23-24.) Pace lodged no objection—in fact, Pace's counsel *agreed*:

| | |
|---|---|
| MR. GOLUB: | Is that, I'm sorry, I'm having trouble hearing, you're saying we're having a unitary trial which means we're have one trial now? |
| THE COURT: | Yes, we're having one trial in front of the jury. |
| MR. GOLUB: | And *we will have no bifurcation*. |
| THE COURT: | *Correct.* And then, therefore, there is no need for any special interrogatory. |
| MR. GOLUB: | Great, okay. |
| | (Oct. 27 Hr'g Tr. 30:20–31:4 (emphasis added).) |

---

[3] Def. Mem. of Law in Support of Mot. *in Limine* ("Pace MIL") 8–14, ECF No. 292.

[4] Plt. Brief in Support of Its Appl. for Bifurcation, ECF No. 249; Pace Bifurcation Opp. 16.

Now, in the guise of an ordinary motion *in limine*, on the eve of trial, Pace reverses course and demands bifurcation of a different sort. Pace forfeited this argument by not raising it when the Court was considering bifurcation. *Cf. Cipciao, LLC v. M Chow One, LLC*, No. 21-929, 2021 WL 4852423, at *3 (2d Cir. Oct. 19, 2021) (summary order) (finding forfeiture when party raised an argument "in the form of a surreply request letter filed more than three months after briefing on the motion to dismiss concluded").[5] The time to make this application has also long passed. The trial of this action is two weeks away, and the parties have been preparing for the single, unified trial that the Court expressly ordered. *See Dotson v. City of Syracuse*, No. 5:11-cv-620 (BKS/ATB), 2019 WL 6337326, at *8 (N.D.N.Y. Nov. 27, 2019) (denying as untimely bifurcation request made at final pretrial conference when the trial date had been set for months). Pace's request should be denied.

### B.    Pace Does Not Meet the Strict Standard for Bifurcation.

Pace does not meet the strict standard for bifurcation. Under Rule 42 of the Federal Rules of Civil Procedure, "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b). However, as Pace argued just three months ago:

> Bifurcation is "the exception rather than the rule" and cannot be granted absent "exceptional instances" and "special and persuasive reasons."
> (Pace Bifurcation Opp. 2 (quoting *Monaghan*, 827 F. Supp. at 245 and *Lewis*, 2000 WL 423517, at *2).)

"As courts have repeatedly stated, the presumption is that all claims in a case will be resolved in a single trial . . . ." *In re Blech Sec. Litig.*, No. 94-cv-7696 (RWS), 2003 WL 1610775, at *9

---

[5] Unless otherwise indicated, all internal citations, quotation marks, footnotes, brackets, alterations, and ellipses are omitted from citations.

(S.D.N.Y. Mar. 26, 2003); *accord Monaghan*, 827 F. Supp. 233 at 1245 ("[G]enerally, efficient judicial administration favors having only one trial whenever possible."). Accordingly, "the party seeking bifurcation shoulders the heavy burden of establishing that bifurcation is warranted." *Altman v. New Rochelle Pub. Sch. Dist.*, No. 13-cv-3253 (NSR), 2017 WL 66326, at *14 (S.D.N.Y. Jan. 6, 2017). Pace argues that bifurcation is warranted for three reasons, all of which lack merit.

### 1.   Pace's "Juror Confusion" Argument Has No Merit.

Pace first argues that bifurcation will reduce juror confusion, urging that that liability and damages evidence are not "inextricably intertwined" and that the evidence of damages is so complex that saving it for a second phase will significantly aid the jury. (Pace MIL 9–11.) Both contentions lack merit.

*First*, there is significant overlap in the evidence of liability and damages. "'Bifurcation may be appropriate where the evidence offered on two different issues will be *wholly distinct*,' but where 'the issues of liability and damages are intertwined,' separating those phases is unlikely to promote the primary interests bifurcation is designed to serve." *Altman*, 2017 WL 66326, at *14 (emphasis added) (quoting *Vichare v. AMBAC Inc.*, 106 F.3d 457, 466 (2d Cir. 1996)). "Separate trials are not appropriate when issues, witnesses and documentary evidence overlap." *In re Blech*, 2003 WL 1610775, at *13. By illustrative example, the Second Circuit found bifurcation inappropriate in a matter where "[s]everal of the same witnesses would have to be called" in each sequential proceeding and where the plaintiff's underlying evidence provides the predicate "of both liability [and] damages." *Vichare*, 106 F.3d at 466. In another case, the court denied bifurcation where "[p]laintiffs [would] be compelled to recall both of its expert witnesses, as well as reintroduce the documentary evidence upon which their opinions are based," if liability and damages were separately tried. *In re Blech*, 2003 WL 1610775, at *15.

Here, multiple witnesses would have to be called in the liability phase and again in the damages phase. For example, although the Court has yet to rule on the parties' *Daubert* motions, both sides seek to have their experts testify on both liability and damages issues. On liability, CBRE's expert, Richard J. Michaels, is expected to testify regarding customs and practices in the real estate industry, and he will explain why Siegel's sharing of commonplace market information was helpful to Pace, consistent with industry customs, and (far from being improper) done in performance of his duties under the parties' Agreements. Then, in respect to damages, Michaels will testify regarding the commissions owed to CBRE under its Agreements with Pace based on CBRE's performance of its obligations thereunder. Although Pace's putative expert witness Suzy A. Reingold should be precluded from testifying at all,[6] under Pace's own view of the case, she likewise would be required to testify during both phases. During the liability phase, Pace would have Reingold testify that Siegel's conduct was not in line with industry customs; and during the damages phase, Pace would have Reingold testify regarding the commissions due to CBRE and the damages supposedly caused by CBRE's subpar advice regarding the Pace-Wenat Leases. Fact witnesses also would be asked to testify in two phases on overlapping issues. For example, Stuart Siegel and Chris Harnden would speak to the underlying conduct that is being challenged in putative Phase 1, to show performance and/or whether there was any valid excuse to pay the contractual commission, and in Phase 2 about their understanding about the calculation of a full market commission and the parties' alleged damages on their respective claims and counterclaims.

There is other substantial overlapping evidence that renders bifurcation improper. For example, although the Court has already ruled that Pace is in breach, CBRE will submit evidence

---

[6] *See* Mem. of Law in Support of Plt. Mot. to Preclude Putative Expert Suzy A. Reingold ("CBRE *Daubert* Mem."), ECF No. 278; Reply Mem. of Law in Further Support of Plt. Mot. To Preclude Putative Expert Suzy A. Reingold ("CBRE *Daubert* Reply"), ECF No. 300.

during the liability phase showing that the Pace-Wenat Leases are covered by the Agreements and

that Pace refused to pay a commission or cooperate in seeking a commission from Wenat.[7] The

rental figures in the Pace-Wenat Leases are critical to measuring CBRE's damages, as

commissions are a percentage of the rents in the leases. To take another example, Pace will seek

to prove at trial that Siegel's (non-existent) "advice" to seek 3% annual escalations was improper

and that Pace's supposed reliance on that advice harmed Pace.[8] To explain why Siegel's supposed

advice was improper, Pace would need to show what the correct escalations should have been and

show whether—and by how much—Siegel's advice departed from that standard. All of that

"liability evidence" substantially overlaps with Pace's putative damages analysis, as Pace is

seeking damages based on the difference between the industry standard and the actual advice.[9]

---

[7] Pace incorrectly asserts that the issues for trial include "whether Defendants breached the subject agreements." (Pace MIL 1, 11; see id. at 12.) On summary judgment, the Court held that "Pace engaged in an anticipatory breach" by "clearly and unequivocally communicat[ing] that it did not intend to cooperate with CBRE in receiving its commission." (SJ Order 25; see id. at 27.) In other briefing, Pace has described this unambiguous holding as a "preliminary finding." (Pace Bifurcation Opp. 7.) There is nothing "preliminary" about a holding made on summary judgment. At the same time, this evidence would be required at the liability phase to give the jury a proper understanding of the facts and to fully explore CBRE's performance.

[8] See CBRE Daubert Mem. 5–13 (arguing that the opinions in the Reingold Declaration are inadmissible).

[9] Pace's authorities are readily distinguishable. See Katsaros v. Cody, 744 F.2d 270, 278 (2d Cir. 1984) (upholding bifurcation where "the two phases involved different types of evidence"); Nnodimele v. Derienzo, No. 13-cv-3461 (ARR)(RLM), 2016 WL 3561708, at *2 (E.D.N.Y. June 27, 2016) (bifurcating where "[t]here will be little if any overlap between the documentary and testimonial evidence"); Hopkins v. Nat'l R.R. Passenger Corp., No. 08-cv-2965 (NGG) (RML), 2016 WL 1588499, at *1 (E.D.N.Y. Apr. 19, 2016) (bifurcating where liability evidence concerned defendant's "security and safety precautions" and damages evidence concerned "injuries sustained by [the plaintiff]," where there was a serious risk of prejudice arising from "emotional and heart-rending testimony" to be admitted in the damages phase, and where the damages phase was likely to be lengthier than the liability phase); Guidi v. Inter-Cont'l Hotels Corp., 2003 WL 1846864, *1, *2 (S.D.N.Y. Apr. 8, 2003) (bifurcating where evidence of liability and damages were "wholly unrelated" and the "degree of witness overlap between the two issues is extremely minimal"); Wright v. Aargo Sec. Servs., Inc., No. 99-cv-9115(CSH), 2001 WL 1035139, at *6 (S.D.N.Y. Sept. 7, 2001) (bifurcating where "the proofs submitted for liability and damages would differ

*Second*, contrary to Pace's argument (Pace MIL 10–11), "[t]he issues in this case are not so complex as to necessitate bifurcation for the purpose of juror comprehension." *WeddingChannel.Com, Inc. v. The Knot, Inc.*, No. 03-cv-7369 (RWS), 2004 WL 2984305, at *2 (S.D.N.Y. Dec. 23, 2004); *accord Epstein v. Kalvin-Miller Int'l, Inc.*, 121 F. Supp. 2d 742, 750 (S.D.N.Y. 2000) ("The defendant has not convinced the Court that this trial has the potential to be enormously complex, particularly given the absence of any medical, scientific, or psychological testimony."). This will be a short trial involving common-law claims and non-technical facts. The damages evidence in this case principally involves an assessment of market commission rates and straightforward mathematical calculations: multiplying rents by market commission rates and totaling them. CBRE's expert accomplishes this in a few paragraphs of his expert report. (Expert Report of Richard J. Michaels, GRI, 7–8, ¶¶ 1–3, ECF No. 275-4; *id.* Exhibits K, L, M.) His testimony will not be materially more involved. Pace's expert did not even opine on these issues, further reducing any potential juror confusion.

Pace claims that the damages evidence on its counterclaims will "involve mathematical calculations and expert testimony concerning, *inter alia*, . . . the *exact financial impact* on the lease terms secured by Defendants of Plaintiff's failure to fully perform the subject agreements (*i.e.*, how the ultimate lease terms obtained by Defendants would have been effected [*sic*] with respect to rent, tax and operating expenses escalations)." (Pace MIL 11.) This argument fails three times over. *First*, CBRE is aware of no admissible evidence on these points, so there is no risk of juror confusion.[10] *Second*, in Pace's opposition to CBRE's *Daubert* motion, it argues at length that

completely"); *Lagudi v. Long Island R.R.*, 775 F. Supp. 73, 74 (E.D.N.Y. 1991) (bifurcating where two trials "would present entirely different evidence").

[10] The closest thing to "evidence" on these points appears to be Reingold's fanciful and wildly untimely opinion that Siegel's "advice" regarding escalations (which is wholly unsupported by the

damages need *not* to be proven with mathematical precision.[11] *Third*, assuming *arguendo* Pace offers evidence on these topics, its damages calculation would appear to be similar in nature to CBRE's damages calculation: straightforward multiplication and addition.[12]

### 2.    A Unified Trial Will Cause No Prejudice.

Pace argues that liability/damages bifurcation is required to reduce the prejudice caused by evidence that it has not paid substantial commissions sought by CBRE. (Pace MIL 12.) This argument is frivolous, and Pace does not identify any prejudice it will suffer from a unitary trial.

Courts evaluating prejudice arguments focus on whether the damages evidence is so sensitive or inflammatory that it may unfairly cloud the jury's view on liability. "[I]f the damages evidence is *particularly inflammatory*, then it may be advisable to bifurcate so that the jury's determination on liability is not clouded by such unrelated evidence." *Altman*, 2017 WL 66326, at *14 (emphasis added). To bifurcate on this ground, the prejudice must be "undue," and bifurcation is properly denied unless "the prejudice would be . . . more than that which is normally experienced" in the typical case. *Monaghan*, 827 F. Supp. at 246. Thus, even evidence of the "brutal nature of [an] attack" and "a description of [the plaintiff's] suffering" have been held insufficiently prejudicial to warrant bifurcation. *Id.*

---

record evidence) caused Pace $60 million in damages, which is inadmissible at trial. (CBRE *Daubert* Mem. 5–13; CBRE *Daubert* Reply 1–8.)

[11] Def. Mem. of Law in Opp. to Plt. Mot. to Preclude Putative Expert Suzy A. Reingold 19–20, ECF No. 288.

[12] Pace cites only a single case where bifurcation was ordered to alleviate jury confusion caused by complex damages evidence, and it involved claims and evidence markedly more complex than here. *See Shepard v. IBM Corp.*, 45 F.R.D. 536, 537 (S.D.N.Y. 1968) (bifurcating patent case because "[t]he issue of damages is often more complex than the issues of validity and infringement"). One of Pace's cases involved a bifurcated *bench trial*, which plainly raises no issues of juror confusion. *See Katsaros*, 744 F.2d at 277–78.

This case is an exceedingly poor candidate for bifurcation on the ground of prejudice. This is an ordinary commercial dispute between two sophisticated business entities. CBRE alleges that Pace failed to pay commissions due under a contract. None of the evidence will be remotely inflammatory or sensitive, and the jury will know from the start of the trial that CBRE is seeking a substantial commission for its services whether trial is bifurcated or not. CBRE's evidence of damages consists mainly of the Pace-Wenat Leases and market commission rates. Michaels' testimony explaining the calculation of the commissions will not inflame the passions of the jurors. Pace has not explained how any prejudice caused by this evidence is undue (because it is not).

Focusing exclusively on the *amount* of damages, Pace argues that evidence that Pace did not pay "millions of dollars" could cloud the jury's views on liability. (Pace MIL 11.) This argument could be made in any case. As Pace's own authority observes, "the proposition that evidence on the question of damages may well have a prejudicial effect on the jury is almost certainly true of any litigation." *Lagudi*, 775 F. Supp. at 75. But as Pace well knows, "[b]ifurcation is 'the exception rather than the rule' and cannot be granted absent 'exceptional instances' and 'special and persuasive reasons.'" (Pace Bifurcation Opp. 2 (quoting *Monaghan*, 827 F. Supp. at 245 and *Lewis*, 2000 WL 423517, at *2).) Evidence of damages—even millions of dollars of damages—does not create an exceptional circumstance. None of Pace's cases suggests as much.[13]

---

[13] Pace's cases on this point do not establish otherwise. Four of those authorities dealt with individual litigants who sustained serious personal injuries, suffered emotional distress, or had sensitive medical conditions. *See Hopkins*, 2016 WL 1588499, at *3 (bifurcating out of concern that "emotional and heart-rending testimony of the plaintiffs as to the pain and suffering they and their loved ones experienced . . . [would] unquestionably cloud a jury's ability to render an objective verdict on the issue of liability"); *Nnodimele*, 2016 WL 3561708, at *2, *1 (bifurcating to prevent evidence of plaintiff's "character and experience"—which included his "history of alcohol use"—from unduly influencing the jury's findings of liability); *Lagudi*, 775 F. Supp. at 75 (bifurcating personal injury action where plaintiff suffered numerous injuries to his teeth and back, and where "evidence about plaintiff's alleged injuries may serve only to confuse the jury");

### 3.  Bifurcation Will Be Inefficient and Wasteful.

As a last-ditch effort, Pace argues that bifurcation will promote judicial economy and efficiency. (Pace MIL 13–14.) To the contrary, "bifurcation would not save significant court resources but instead could prolong the trial at a time when the Court is continuing to work through a back-log of trials that have been delayed due to the COVID-19 pandemic." *Mattsson v. Pat McGrath Cosms. LLC*, No. 21-cv-5187(JSR)(SLC), 2022 WL 1658516, at *4 (S.D.N.Y. May 25, 2022). An uninterrupted, unitary trial is the best way preserve judicial resources.

Pace's contentions to the contrary are meritless. *First*, Pace argues that bifurcation will allow the jury to "fully focus[] on the correct complex issues at the appropriate time." (*Id.* at 13.) This reiterates Pace's failed argument that bifurcation would help prevent juror confusion. As explained above, "[t]he issues in this case are not so complex as to necessitate bifurcation for the purpose of juror comprehension." *WeddingChannel.Com, Inc.*, 2004 WL 2984305, at *2. The evidence will be straightforward and understandable, and the damages evidence is not complex or time-consuming to present. Far more of the trial will be devoted to demonstrating CBRE's extensive performance of the Agreements: coordinating meetings, touring buildings, and discussing terms with potential landlords. And in a district that regularly holds trials on highly complex matters under the federal securities, commodities, and antitrust laws, Pace's invocation of the "complex nature of the industry-specific real estate concepts" rings hollow. (Pace MIL 14.)[14]

---

*Buscmemi v. Pepsico, Inc.*, 736 F. Supp. 1267 (S.D.N.Y. 1990) (bifurcating because of the "potential for evidence of the plaintiff's emotional distress to prejudice the jury"). A fifth authority concerned the prejudice caused by evidence that the corporate defendant skirted the law by paying the plaintiff in "bogus check[s]." *Wright*, 2001 WL 1035139, at *5–*6. None finds undue prejudice in dry paper evidence that a corporate defendant's breach caused millions in damages.

[14] Pace's principal authority is readily distinguishable. *See Crown Cork & Seal Co., Inc. Master Ret. Trust v. Credit Suisse First Boston Corp.*, 288 F.R.D. 335 (S.D.N.Y. 2013) (bifurcating securities fraud trial expected to "last six to eight weeks," "include 80 to 100 witnesses and hundreds, if not thousands, of documents," and involve "complex" concepts).

*Second*, Pace's contention that the damages phase will be rendered unnecessary if no liability is found is an "argument [that] could be made in every case," and courts routinely reject it. *Mensler v. Wal-Mart Trans., LLC*, No. 13 CIV. 6901 (JCM), 2015 WL 7573236, at \*4 (S.D.N.Y. Nov. 24, 2015) ("Defendants' argument that they are likely to succeed at the liability stage, thereby eliminating the need for a second trial, is not persuasive. . . . The Court cannot predict who will be successful at the liability stage, and therefore this argument does not justify bifurcation."). Much more than this truism is required. Accordingly, "bifurcation remains the exception, not the rule." *In re Lehman Bros. Holdings, Inc.*, No. 10-cv-6200 RMBFM, 2011 WL 2651812, at \*3 (S.D.N.Y. June 22, 2011).[15]

\* \* \*

For all these reasons, bifurcation should be denied. As the Court ruled less than three weeks ago, there should be "one trial in front of the jury." (Oct. 27 Hr'g Tr. 30:23-24.)

## II.   EVIDENCE OF A BENEFIT TO THE PRINCIPAL IS ADMISSIBLE.

In addition to its meritless bifurcation request, Pace seeks to exclude critical reasons why Stuart Siegel sent commonplace market information to Pace's landlord, Wenat. (Pace MIL 2–7.) Although this application is at least a proper subject for a motion *in limine*, it has no basis in the

---

[15] Pace's cases are inapposite. *See Hopkins*, 2016 WL 1588499, at \*3 (bifurcating to, among other things, alleviate prejudice from "emotional and heart-rending" damages testimony, and where the "damages phase is likely to be lengthy"); *Paulay v. John T. Mather Mem. Hosp.*, No. 14-cv-5613 (SFJ)(AYS), 2016 WL 829992, at \*2 (S.D.N.Y. Mar. 3., 2016) (bifurcating personal injury case involving "physical pain" and "severe emotional distress" where liability and damages evidence was "not so intertwined as to render bifurcation inappropriate"); *Wright*, 2001 WL 1035139, at \*5–\*6 (bifurcating where liability and damages evidence was "not . . . inextricably intertwined" and where it would alleviate prejudice created by evidence that the corporate defendant skirted the law by paying the plaintiff in "bogus check[s]"); *Shepard*, 45 F.R.D. at 537 (bifurcating patent infringement trial because "[t]he issue of damages is often more complex than the issues of validity and infringement").

law and must be rejected. This evidence is highly relevant to numerous claims and defenses, and it directly undermines Pace's central trial defense.

### A. Evidence of the Benefits to the Principal and the Agent's Intent Are Relevant to Liability Under the Faithless Servant Doctrine.

Pace's argument that Siegel cannot explain to the jury why he sent commonplace market information to Wenat is completely without merit. (Pace MIL 2–7.)

Before discussing why, it is useful to summarize the challenged evidence. The centerpiece of Pace's trial defense is that Siegel allegedly acted disloyally by sending common market information to Pace's landlord, Wenat. (JPTO 14–15.) To defend against that contention, Siegel will testify that he knew, based on his experience in the market and with Sam Weinberg, that Wenat had wildly unrealistic notions of the rents it could charge. (Declaration of Stuart Siegel ("Siegel Decl.") ¶¶ 7, 19, ECF No. 202.) He will testify that when he received a request from Wenat for market information, he viewed it as a prime opportunity to ground Wenat in the market and confirm that Pace had realistic alternatives nearby. (*Id.* ¶¶ 14–15.) If Wenat did not demand a realistic, market-based price, Pace could easily walk away. Pace seeks to exclude all this evidence. (Pace MIL 1, 6–7.) In a related attack, Pace has separately moved to preclude CBRE's expert, Richard J. Michaels, from opining that Siegel's conduct benefitted Pace.[16] Through these motions, Pace seeks to short-circuit any semblance of a fair trial.

This evidence cannot be excluded. It is directly relevant to whether Pace has met its burden to show that CBRE's conduct was disloyal. Numerous cases demonstrate the admissibility of precisely this kind of evidence. The reported cases show that courts and juries commonly examine

---

[16] *See* Mem. of Law in Support of Def. Mot. to Strike Certain Sections of Richard J. Michaels' Expert Report and Expert Rebuttal Report and to Limit the Trial Testimony of Richard J. Michaels 18–22, ECF No. 276.

whether the challenged actions benefitted the principal and reasons why the agent acted in the challenged manner. Pace's own authorities demonstrate this point, including its leading authority, *Feiger v. Iral Jewlery, Ltd.*, 363 N.E.2d 350 (N.Y. 1977) ("*Feiger III*"), which Pace cites throughout its motion. (Pace MIL 2–5, 7.)

As explained in CBRE's *Daubert* opposition, *Feiger* involved a salesman suing for commissions wrongfully denied. *See Feiger v. Iral Jewelry, Ltd.*, 382 N.Y.S.2d 216, 217 (N.Y. Sup. Ct. 1975) ("*Feiger I*"), *aff'd*, 52 A.D.2d 524 (1st Dep't 1976) ("*Feiger II*"), *aff'd*, *Feiger III*, 363 N.E.2d 350. Claiming disloyalty, the defendant argued that no commissions were due because the salesman started a competing business venture during his employment. *See Feiger I*, 382 N.Y.S.2d at 217–18. The trial court rejected this defense, holding that there was "no hint" of any misconduct to support it because there was no "advantage achieved by plaintiff [a]fter leaving . . ., *or any damage done to defendant [b]efore leaving*." *Id.* at 219 (emphasis added). The First Department affirmed without opinion. *Feiger II*, 52 A.D.2d 524. The New York Court of Appeals affirmed, squarely rejecting the disloyalty defense on the ground that the plaintiff "*never lessened his work on behalf of defendant*" and "never misappropriated to his own use any business secrets or special knowledge." *Feiger III*, 363 N.E.2d 351 (emphasis added). In other words, there was no disloyalty *because* the conduct did not harm the principal or secretly benefit the agent.

In another of Pace's cases (Pace MIL 4), the plaintiff sued his former employer for breach of an employment agreement. *Appel v. Fischbach Corp.*, No. 93-cv-5146(FB), 1998 WL 470497 (S.D.N.Y. Aug. 10, 1998), *aff'd* 189 F.3d 460 (2d Cir. 1999) (unpublished). Invoking the faithless servant doctrine, the defendant counterclaimed for breach of fiduciary duty, asserting that the plaintiff had been disloyal by retaining company documents (among other things). *See Appel*, 1998 WL 470497, at *1, *7. After a bench trial, the court found that the defendant kept its own copies

of the documents and thus was not deprived of them, that the documents did not contain confidential information, and the plaintiff received no benefit from the documents. *See id.* Based on these findings, the court denied the faithless servant claim because the plaintiff "did not materially breach any fiduciary duty owed to [defendant]," and because the defendant "*did not suffer any damages or harm as a result thereof.*" *Id.* at *8 (emphasis added).

*Feiger* and *Appel* each squarely demonstrate the relevance (and importance) of evidence that the agent's actions caused no harm or benefitted the client: it shows that there is *no disloyalty.*

The agent's subjective good intentions are just as relevant. Without discussing the facts, Pace cites *Webb v. Robert Lewis Rosen Assocs., Ltd.*, which denied summary judgment on faithless servant claims. No. 03-cv-4275 (HB), 2003 WL 23018792, at *2 (S.D.N.Y. Dec. 23, 2003) ("*Webb I*"), *aff'd*, 128 F. App'x 793 (2d Cir. 2005) (summary order) ("*Webb III*") (cited at Pace MIL 3). After *Webb I*, the faithless servant claims proceeded to a bench trial, and the court rejected the faithless servant claim on the merits—relying squarely on the type of evidence that Pace claims is inadmissible. *Webb v. Robert Lewis Rosen Assocs., Ltd.*, No. 03-cv-4275 (HB), 2004 WL 1469490, at *1 (S.D.N.Y. June 29, 2004) ("*Webb II*"), *aff'd*, *Webb III*, 128 F. App'x 793.

In *Webb*, the principal, a television director, claimed that his agent had acted disloyally in negotiations with FOX by pushing another client for the same position. *See Webb II*, 2004 WL 1469490, at *1–*4, *6. A focus at trial was a letter the agent had written to FOX that listed both clients as prospective candidates. *See id.* at *3. The letter spoke glowingly of the plaintiff, stating that he was the "finest baseball director in America today." *Id.* For the other candidate, the agent included a "bare paragraph . . . totally devoid of any accolades" stating that he "doubt[ed] CBS would let him escape" from his existing contract. *Id.* The agent claimed he included the other

candidate to show his experience, and he testified that he believed the letter "only presented one viable candidate"—the plaintiff. *Id.* In other words: he sent the letter *to help his client*.

Whether the letter helped or harmed the plaintiff and, just as importantly, the agent's reasons for sending the letter were thus two key questions in the case. Crediting the agent's testimony that "*he believed, and conveyed to [the station], that [plaintiff] was the only viable candidate for the . . . position*," the court rejected the faithless servant claim. *Id.* at *6 (emphasis added). This ruling was squarely upheld on appeal. *See Webb III*, 128 F. App'x at 796 (holding that there was no error in the district court's interpretation of the letter in light of agent's testimony that it "essentially presented [plaintiff] as the only viable candidate"). In other words, evidence that the agent intended the letter to help the principal, and that the letter did help the principal, were not merely relevant but critically important.[17]

Together, these decisions show that whether the challenged conduct harmed or benefitted the principal, and whether the agent acted to benefit the principal, are highly relevant to the issue of loyalty. Siegel's testimony that he sent commonplace market information to Wenat to help Pace directly undermines Pace's faithless servant defense. Pace cannot avoid this evidence at trial.

Pace's argument to the contrary rests on a fundamental misunderstanding of the law. In arguing that this evidence is irrelevant, Pace relies exclusively on the following principle:

> One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary. Nor does it make any difference that the services were beneficial to the principal, or that the principal suffered no provable damage as a result of the breach of fidelity by the agent.

---

[17] *See also Miller v. Levi & Korsinsky, LLP*, No. 20-cv-1390 (LAP), 2021 WL 535599, at *6 (S.D.N.Y. Feb. 12, 2021) (dismissing faithless servant counterclaim where partner's alleged misconduct "was motivated, at least in part, by increasing the amount of referred business she received as a partner of [law firm]—*i.e.*, *increasing a benefit to [the law firm]* in the form of the amount of business that flowed to the firm" (emphasis added)).

*Feiger III*, 363 N.E.2d at 351.

However, this is a rule of damages, not a rule for determining liability. By its own terms, *it assumes that disloyalty*—a breach of fiduciary duty—has been shown, and it discusses the consequences of such disloyalty. Thus, the first sentence provides that "one . . . *who is faithless*" generally cannot recover commissions. *Id.* (emphasis added). The second sentence provides that, where there has been a "*breach of fidelity by the agent*," the agent cannot defeat the claim based on a showing of no harm or even benefits. *Id.* (emphasis added) Neither sentence addresses the standard for measuring disloyalty.[18] As shown above, whatever the standard, evidence that the challenged conduct was beneficial (or at least not harmful) and was intended to benefit the principal is critical to analyzing loyalty.

Pace cites nearly a dozen cases quoting this principle without discussing their facts or explaining how they apply here. (Pace MIL 2–6.) Pace evidently cited these authorities solely to show the broad acceptance of the *Feiger* standard. In fact, it appears that Pace did not even read its cited decisions, as three of them—*Feiger*, *Appel*, and *Webb*—are flatly contrary to its position.[19]

---

[18] As the Court knows, New York courts employ two different standards to evaluate whether challenged conduct is disloyalty. (SJ Order 20–21.) The instant motion does not directly raise the issue of which standard should apply in this case.

[19] As Pace did not bother to explain why these authorities support its position, only a representative few are distinguished here. Each of these decisions involves classic bad conduct where it is difficult to imagine a defense that the conduct benefitted, or was intended to benefit, the principal. *See Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 203–04, 201 (2d Cir. 2003) (per curiam) (noting that investment banker withheld "cash, stocks, and other interests" belonging to the principal and acted disloyally in "four out of five" of his primary areas of responsibility over many months" and that the agent "did not dispute the district court's findings that he breached his duties of loyalty and good faith"); *Pawlowski v. Kitchen Expressions Inc.*, No. 17-cv-2943-ARR-VMS, 2017 WL 10259773, at *3 (E.D.N.Y. Dec. 15, 2017) (employee performed competing freelance "work on the side" for six years); *Jones v. Dana*, No. 06-cv-0159 (RPP), 2006 WL 1153358, at *29 (S.D.N.Y. May 2, 2006) (finding a breach where defendant "took advantage of Plaintiff, a recent widow; grossly exploited Plaintiff's desire to provide a secure financial future for herself and her disabled son; stole money from Plaintiff under the guise of

Pace's single authority addressing the relevance of intent evidence is a Tenth Circuit products case tried under Oklahoma law, which is utterly inapposite to New York's faithless servant doctrine.[20]

Pace only tries to explain why one of its faithless servant authorities, *Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216 (2d Cir. 2020), supports its position. (Pace MIL 5–6.) For two reasons, *Yukos* does not. First, *Yukos* dealt with textbook breaches of loyalty, including theft of $500,000 and taking a $1.2 million kickback, and it does not appear that the agent attempted to argue on appeal that this conduct was loyal. *See Yukos*, 977 F.3d at 224–25. Second, *Yukos* is about damages. On appeal, the agent argued that the claims failed as a matter of law because there was no evidence *of damages*, as one of his schemes yielded a benefit and the other caused no harm. *Id.* at 240, 224–25. The court rejected his argument, holding that "compensation paid by a principal to a faithless servant can satisfy the 'damage' element of a breach of fiduciary duty claim." *Id.* at 240. *Yukos* therefore says nothing about whether evidence of benefits is relevant to liability.

The evidence Pace seeks to exclude is highly relevant, and Pace's motion should be denied.

## B.    The Challenged Evidence is Relevant to CBRE's Performance.

The challenged evidence is also relevant to CBRE's performance, the second element of its contract claims *See Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc.*, No. 18-cv-9480 (CM), 2022 WL 1137137, at *12 (S.D.N.Y. Apr. 18, 2022) ("Under New York law, a breach of contract plaintiff must prove the four following elements: (1) a valid and enforceable agreement; (2) adequate performance by the plaintiff; (3) breach by the defendant; and (4) damages.").

---

being Plaintiff's friend and trusted advisor; and then repeatedly sought to cover-up her actions so that they would not be discovered by Plaintiff"); *City of Binghamton v. Whalen*, 32 N.Y.S.3d 727, 728–29 (3d Dep't 2016) (former employee had pled guilty to grand larceny and admitted to stealing more than $50,000 over a five-year period).

[20] *See Gray v. Hoffman-La Roche, Inc.*, 82 F. App'x 639, 651, 651n.6 (10th Cir. 2003) (unpublished) (holding that defendant's profit motive was not relevant to claims of product liability, negligence, and breach of warranty).

The evidence at trial will show that CBRE and Siegel did everything that Pace asked of them in connection with the Agreements. Under the contracts, CBRE agreed to "facilitate and conduct all aspects of the space evaluation, selection and negotiation process based upon our agreed strategy" and to "offer advice and guidance as appropriate." (SJ Order 3.) In line with these responsibilities, Siegel identified numerous potential properties to fit Pace's ever-changing needs, he took Pace on numerous space tours, he negotiated on Pace's behalf with potential landlords, and much more. (CBRE Rule 56.1 Stmt. ¶¶ 84–89, ECF No. 190.) Consistent with CBRE's and Pace's "agreed strategy," CBRE's performance also extended to supporting Pace in its negotiations with Wenat, as and when requested by Pace. The evidence will show Harnden asked for Siegel's feedback on an early offer by Wenat, and Siegel explained to him that the terms were above-market. (Dep. Tr. of Stuart Siegel ("Siegel Tr."), 193:16–194:4, ECF. No. 189-4; Dep. Tr. of Christopher Harnden ("Harnden Tr."), 168:4–171:2, ECF No. 189-5.) Harnden also asked for market information to better inform Pace regarding market conditions, and Siegel provided that as well. (Siegel Tr. 191:13–192:2; Harnden Tr. 179:8–180:19.) Siegel's provision of commonplace market information to Wenat is part and parcel of CBRE's performance. Siegel did it to help Pace in its negotiations, Siegel promptly disclosed it to Harnden, and Harnden reacted enthusiastically *because* it helped the negotiations. (Siegel Decl. ¶¶ 18, 22.) Because this is part of CBRE's performance, it is plainly relevant and admissible at trial.

### C.    The Challenged Evidence is Relevant to Pace's Counterclaims.

The challenged evidence is likewise relevant to numerous aspects of Pace's counterclaims for breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing.

*First*, Pace asserts a breach of fiduciary duty counterclaim based on Siegel's provision of information to Wenat, seeking compensatory damages and restitution of commissions already paid. (JPTO 10–12, 40.) This is the same argument as Pace's faithless servant defense, except

asserted affirmatively with a damages claim. For the reasons discussed above, the benefit to Pace and Siegel's subjective intention to help Pace are highly relevant because they show *that there was no breach*. *See, e.g.*, *Webb II*, 2004 WL 1469490, at *6 (rejecting breach of fiduciary duty claim based in part on the agent's testimony that he acted to benefit the principal); *Appel*, 1998 WL 470497, at *8 (denying breach of fiduciary duty claim because the plaintiff "did not materially breach any fiduciary duty owed to [defendant]," and because defendant "did not suffer any damages or harm as a result thereof").

*Second*, Pace asserts a counterclaim for breach of the implied covenant of good faith and fair dealing based on the same conduct: Siegel's provision of information to Wenat. (JPTO 13–14, 41–42.) "Under case law dealing with the implied covenant of good faith, the Second Circuit has noted that whether a party acted in good faith 'is governed by a subjective, rather than an objective standard.'" *Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 451 (S.D.N.Y. 2018) (quoting *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989)), *aff'd*, 777 F. App'x 531 (2d Cir. 2019) (summary order). Courts have also accepted that objective evidence of good faith is relevant. *See id.* The benefit to Pace, and Siegel's subjective motivation to help Pace, are therefore both highly relevant because they show CBRE's good faith.

*Third*, the benefit to Pace is relevant to Pace's efforts to recover millions of dollars[21] in compensatory damages on its fiduciary duty and implied covenant counterclaims. (JPTO 40, 41.) If the information helped Pace achieve better terms on its leases, then no compensatory damages

---

[21] Pace's estimates of these damages have varied dramatically. *Since discovery closed*, Pace has offered damages estimates of $1 million, solely for the implied covenant claim (Third Amended Answer, ¶ 123, ECF No. 163; *id.* at 41, Prayer for Relief (d)); $50 million each for the fiduciary duty and implied covenant claims (JPTO 40, 41); and $60 million, seemingly for breach of fiduciary duty and "negligence," which is not a claim in this case (Declaration of Suzy A. Reingold ¶ 8, ECF No. 212).

can be recovered. *See, e.g.*, *Margrabe v. Sexter & Warmflash, P.C.*, 353 F. App'x 547, 549 (2d Cir. 2009) (summary order) (rejecting breach of fiduciary duty claim for failure to allege damages); *Util Auditors, LLC v. Honeywell Int'l Inc.*, No. 17-cv-4673(JFK), 2018 WL 5830977, at *4 (S.D.N.Y. Nov. 7, 2018) (dismissing implied covenant claim for lack of damages).[22]

### D.    The Challenged Evidence Is Not Unfairly Prejudicial.

Pace's argument (Pace MIL 7–8) that the challenged evidence should be excluded as unfairly prejudicial is frivolous. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). "Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*." *Costantino v. David M. Herzog, M.D., P.C.*, 203 F.3d 164, 174-75 (2d Cir. 2000). "The unfairness contemplated involves some adverse effect beyond tending to prove a fact or issue that justifies admission." *Id.* Thus, "in general[,] in the absence of a significant showing of unfair prejudice, evidence with substantial probative value should not be excluded." *Gentile v. County of Suffolk*, 926 F.2d 142, 151 (2d Cir. 1991).

Here, as explained above, the challenged evidence is highly probative of numerous claims and defenses in this case. It directly refutes Pace's contentions that CBRE was disloyal, acted in bad faith, or caused any damages, and it aids in showing the sufficiency of CBRE's own

---

[22] Although the Court has held that Pace need not prove these damages in order to be "relieved of paying [a] commission" (SJ Order 22), it is axiomatic that Pace must prove its compensatory damages to recover them. *See Semi-Tech Litig., LLC v. Bankers Trust Co.*, 353 F. Supp. 2d 460, 482 (S.D.N.Y. 2005) ("[A] requirement of proximate causation applies . . . where compensatory damages are sought for a breach of fiduciary duty under New York law.") (citing *LNC Invs., Inc. v. First Fidelity Bank, N.A.*, 173 F.3d 454, 465 (2d Cir. 1999)), *aff'd*, *In re Bankers Trust Co.*, 450 F.3d 121 (2d Cir. 2006).

performance. Although this evidence might be "prejudicial" in the sense that it severely undermines Pace's contentions, it cannot seriously be argued that it is *unfairly* prejudicial.[23]

* * *

Accordingly, the challenged evidence should not be excluded from trial.

## CONCLUSION

For the foregoing reasons, Pace's motion should be denied in its entirety.

Dated:  November 14, 2022
        New York, New York

Respectfully submitted,

Greenberg Traurig, LLP

By: */s/ Jeff E. Scott*
    Jeff E. Scott

**GREENBERG TRAURIG, LLP**
Jeff E. Scott (*admitted pro hac vice*)
1840 Century Park East, Suite 1900
Los Angeles, California 90067
Tel. (310) 586-7715
scottj@gtlaw.com

**GREENBERG TRAURIG, LLP**
Jennifer A. Surprenant
One Vanderbilt Avenue
New York, New York 10017
Tel. (212) 801-9200
surprenantj@gtlaw.com

**GREENBERG TRAURIG, LLP**
Benjamin Wood
1 North Lexington Avenue, Suite 800
White Plains, New York 10601
Tel. (914) 286-9211
woodb@gtlaw.com

---

[23] Pace's sole authority is readily distinguishable. *See United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1193 (2d Cir. 1989) (upholding exclusion of evidence that "would show the state of mind of [non-party] lawyers" advising the defendant, when the fact in issue was the defendant's own state of mind).