UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X  Case No. 17-cv-02452 (ALC) (SN)
CBRE, INC.,

                            Plaintiff,

    -against-


THE PACE GALLERY OF NEW YORK, INC. AND
THE PACE GALLERY LLC, D/B/A PACE GALLERY,

                           Defendants.
-------------------------------------------------------------------X


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' FRCP 50 MOTION


                                         AARON RICHARD GOLUB, ESQUIRE, P.C.
                                         Attorneys for Defendants
                                         24 East 64th Street- Fifth Floor
                                         New York, New York 10065
                                         ph: (212) 838-4811
                                         fx: (212) 838-4869

**Standard**

In <u>Jones v. Associated Universities, Inc</u>., 870 F.Supp. 1180, 1192-1193 (E.D.N.Y. 1994) the court held:

> "The ultimate question for the Court to decide in a Rule 50 motion is whether there exists a 'legally sufficient evidentiary basis for a reasonable jury to find' for a party that has been fully heard at trial on an issue. Fed.R.Civ.P. 50(a). 'In determining whether the evidence is sufficient the court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury. Instead, it must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence'… Judgment as a matter of law 'may only be granted where there is 'such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture,' or if the evidence is 'so overwhelming that reasonable and fair minded persons could only have reached the opposite result'
> …
> In evaluating the sufficiency of the evidence, however, the court does not restrict itself solely to the evidence that supports a nonmovant's case…Rather, the court also must consider the evidence favoring the movant to the extent that it is uncontradicted and unimpeached…Further, as Professors Wright & Miller note: 'The party with the burden of proof does not make an issue for the jury by relying on the hope that the jury will not trust the credibility of the witnesses. If all of the witnesses deny that an event essential to plaintiff's case occurred, he cannot get to the jury simply because the jury might disbelieve these denials. There must be some affirmative evidence that the event occurred.'
>
> In the last analysis, the message of Rule 50 is that a motion for judgment as a matter of law should be granted where the court determines that (i) 'there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party' on a particular issue, and (ii) 'a favorable finding on that issue' is required in order for the relevant claim to be maintained under the controlling law" (internal citations omitted).

<u>See</u> also <u>Breathe LLC v. White Fox Ventures, Inc</u>., 339 F.Supp.3d 259, 261 (S.D.N.Y. 2018).

**There Is No Legally Sufficient Evidentiary Basis for a Jury to Find Against Defendants' Breach of Fiduciary Duties and Faithless Servant Doctrine Counterclaims and Affirmative Defenses**

It is undisputed that CBRE owed fiduciary duties to Pace and that Pace's damages are its request to be relieved from paying a commission to CBRE. All that remained to be proven at trial with respect to breach of fiduciary duty was that CBRE breached its duty of loyalty to Pace by

corresponding with and providing market information to Weinberg without obtaining consent from Pace and without notifying Weinberg that CBRE was Pace's broker.  The evidence is crystal clear that Stuart Siegel ("Siegel") exchanged 11 emails with Lisa Weinberg ("LW"), Pace's adversary and counterparty in lease negotiations, and that CBRE never notified Weinberg that CBRE was Pace's broker or sought prior consent from Pace.  Similarly, with respect to the faithless servant doctrine, Pace proved that CBRE engaged in misconduct by communicating with a representative of Pace's landlord, by omitting to disclose any conflict of interest to Pace and by omitting to disclose any conflict of interest to Weinberg and that CBRE's misconduct was a breach of its duty of loyalty or good faith to Pace.

Siegel testified as follows:

(i) Siegel failed to call Chris Harnden ("Harnden") when Siegel received the first email from LW (255:9-17);

(ii) Siegel emailed comps to LW without obtaining Harden's prior approval or consent (258:21-24; 259:23-25);

(iii) Siegel supplied "very important market information" to LW without speaking with Harnden (259:7-15);

(iv) Landlords and tenants are on opposite sides of a transaction and are adverse parties (260:4-9; 272:17-20);

(v) LW was interested in learning about the market (256:24-257:1);

(vi) Comps are very important market information (258:25-259:2);

(vii) Siegel failed to tell anybody at CBRE that he intended to supply LW with market information (268:11-15);

2

(viii)     Siegel failed to report to his manager, Elaine Kleinberg ("Kleinberg"), to his business partner, Matt Bergey ("Bergey"), or to CBRE's Legal Department that Siegel was communicating with the landlord while representing the tenant (278:16-19; 309:3-6);

(ix)     Siegel never reported a potential conflict of interest to any CBRE manager (296:16-21);

(x)     There is not a single contemporaneous document proving that Siegel spoke with Harnden in October 2014 and informed him of Siegel's communications with LW (285:2-12);

(xi)     Even crediting Siegel's testimony that he called Harnden in October 2014 and informed him of Siegel's communications with LW, Harnden never expressly and unequivocally stated to Siegel that Harnden approved of Siegel's communications with LW (296:1-5; 387:5-12);

(xii)     Siegel never sought or obtained written confirmation from Harnden that Harnden approved of Siegel's communications with LW (296:12-15);

(xiii)     Siegel failed to send Harnden the same comps that Siegel sent to LW and failed to inform Harnden that Siegel had previously supplied comps to LW (297:7-20; 302:22-303:1);

(xiv)     Siegel failed to send Harnden the CoStar Report that Siegel sent to LW and failed to tell Harnden that Siegel had sent the CoStar Report to LW (301:18-21);

(xv)     Siegel failed to forward to Harnden the 11 emails Siegel exchanged with LW in October 2014 (302:6-9);

3

(xvi) CBRE does not maintain any documents authorizing a broker to provide information to a landlord while representing a tenant (342:23-343:5);

(xvii) Even crediting Siegel's testimony that he provided comps and a CoStar Report to LW to give the landlord a reality check because its asking price was too high, Siegel did not know in October 2014 the prices that Weinberg was asking per floor and could not have known whether the prices in the comps and CoStar Report were higher or lower than Weinberg's asking prices (345:4-11);

(xviii) Siegel understood from the specific language used in LW's emails that LW intended to use the market information supplied by Siegel in conjunction with Weinberg's future development for Pace (353:10-16);

(xix) The CoStar Report supplied by Siegel to LW was a complete survey of all available space in Chelsea (354:24-355:6);

(xx) Siegel failed to inform LW that he was Pace's exclusive broker because Siegel "felt it was Pace's responsibility to tell Weinberg who I was" (247:14-17); and

(xxi) LW asked for market information to get a handle on the Chelsea market and understanding the market is the most important thing for a broker dealing in Chelsea (489:19-490:9).

Kim Brennan ("Brennan"), CBRE's 30(b)(6) witness, testified as follows:

(i) Comps are important in negotiating a deal (887:12-15);

(ii) Brennan testified at her deposition that it is not ethical for a broker to give information to a landlord in its lease negotiation with a tenant (911:25-912:3);

4

(iii)   Brennan testified at her deposition that Siegel supplying comps and a CoStar Report to LW was in conformity with the standards of integrity and fair dealing espoused by CBRE only if Siegel discussed it with his client (912:4-8);

(iv)   Brennan testified at her deposition that she has not seen any evidence that Siegel ever informed Pace that Siegel was supplying LW with comps or a CoStar Report or that Siegel was communicating with LW (912:21-913:2);

(v)   Brennan testified at her deposition that Siegel never told her that he had Pace's consent to supply market information to Weinberg (913:3-7);

(vi)   Brennan testified at her deposition that communicating with Weinberg and supplying comps and a CoStar Report to Weinberg is not consistent with CBRE's standards of integrity and fair dealing with its clients (913:8-13);

(vii)   Brennan testified at her deposition that she would not have supplied comps and a CoStar Report to Weinberg (915:9-15);

(viii)   Brennan testified at her deposition that she does not know any other broker that would have supplied the landlord with comps and a CoStar Report while representing the tenant (915:16-19);

(ix)   Brennan testified at her deposition that she had never before seen a broker who was representing a tenant supply comps and a CoStar Report to the landlord (915:20-21);

(x)   Brennan testified at her deposition that she was surprised and concerned upon learning that Siegel supplied LW with comps and a CoStar Report while representing Pace (915:22-916:19);

5

(xi)   Brennan testified at her deposition that if Siegel had asked her to approve of him supplying a landlord with comps while Siegel was representing the tenant, she would have said, "No" (916:20-25); and

(xii)  Brennan testified at her deposition that Siegel never told her that Harnden approved of Siegel supplying comps and a CoStar Report to LW (932:21-23).

Paul Walker ("Walker") testified as follows:

(i)    Walker could not name a single instance where he sent comps and a CoStar report to a landlord while representing a tenant (703:14-18);

(ii)   Walker testified at his deposition that landlords and tenants tend to have conflicting interests and are in a conflict of interest relationship (711:15-712:3);

(iii)  CoStar is an important tool for brokers and Walker uses CoStar in his business almost every day (792:6-7; 792:18-20);

(iv)   Comps are not readily available and "[y]ou have to work to acquire comps" (793:5-12);

(v)    Siegel never told Walker that Siegel had exchanged 11 emails with LW in October 2014 (794:6-8); and

(vi)   Siegel never told Walker that Siegel obtained permission from Harnden to supply comps and a CoStar Report to LW (795:11-17).

Brett Kaye ("Kaye") testified as follows:

(i)    One cannot google all of the comps in a particular geographical area (1001:18-23);

(ii)   Kaye cannot recall ever having shared comps and a CoStar Report with a landlord while representing a tenant (1003:17-24);

6

(iii)   Kaye testified at his deposition that if he thought that it would be good for his client to supply an adverse landlord with comps and a CoStar Report, Kaye would communicate first with his client (1007:18-23); and

(iv)   Kaye testified at his deposition that he would use CoStar, not Google, to obtain a retail survey (1014:15-22).

Samuel Weinberg ("SW") testified as follows:

(i)    Weinberg may have done "some background checking" with respect to comps to determine "what was in the marketplace" (1029:13-16);

(ii)   SW, LW and Andrew Weinberg ("AW") probably had some internal discussions concerning "what's in the market" prior to deciding on pricing for Pace's space (1031:1-4);

(iii)  "Normally," SW would have asked LW to check out the market rents in Weinberg's geographical area (1041:9-12);

(iv)   SW testified at his deposition that he believes that he asked LW to check on the market for rents in Chelsea because it would behoove Weinberg to determine whether they "were really right in [their] interpretation of the market" (1042:22-1043:18);

(v)    SW wanted market information so he sent LW on a mission to obtain it (1043:19-21);

(vi)   SW wanted to verify Weinberg's understanding of the market in Chelsea (1044:1-3);

(vii)  LW and AW gave SW advice about some aspects of the market, including rental rates (1051:21-1052:3);

7

(viii)  If SW had known that CBRE was representing Pace, SW would not have asked LW to ask CBRE for comps and a CoStar Report (1052:8-15);

(ix)  SW does not think it is "correct" for a broker to supply information to a landlord while representing a tenant (1053:8-12); and

(x)  SW sent LW on a mission to obtain market information because she is experienced in brokerage (1056:23-1057:2).

LW testified as follows:

(i)  In 2014, SW directed LW to ask Siegel for market information and LW did so (1087:18-20; 1088:4-7);

(ii)  LW wanted "color on the market," which means "[w]hat is going on in the market[,] deals that are done, available space, rental rates" (1089:25-1090:16);

(iii)  Even though Weinberg was in Chelsea for many years and owned two buildings in Chelsea, LW did not know "the up-to-minute information" (1090:17-21);

(iv)  LW was counting on Siegel to give her market information that would make her current in terms of her knowledge of the market (1090:22-25);

(v)  Having market information in real estate is quite important because you know or have a general idea of what everybody else is doing in the market (1091:1-7);

(vi)  When LW was seeking market information, she wanted market information concerning what everybody else in the area was charging, what was available, past deals that had been done, current space available for deals and anything going on in the marketplace (1091:19-24);

(vii)  Siegel never told LW that he had a brokerage agreement with Pace (1092:8-11; 1095:14-19);

(viii)     Siegel fulfilled LW's request by supplying her with comps (1100:13-15);

(ix)     It is LW's business practice to share market information such as comps with SW and AW and to sit down with SW and AW to discuss market information such as comps (1100:16-1101:8);

(x)     LW asked Siegel for a CoStar Report at the direction of SW and she obtained a CoStar Report from Siegel (1106:4-15); and

(xi)     Siegel never told LW that Weinberg's prices for the new development were too high (1107:7-10).

Richard Michaels ("Michaels"), Plaintiff's expert, testified as follows:

(i)     Michaels cannot recall a single instance in his 55-year career in which he supplied a landlord with comps and a CoStar Report while representing a tenant (1166:3-6);

(ii)     Michaels cannot recall a single instance in his 55-year career in which he was able to persuade a landlord that the landlord's rental prices were too high and that the landlord should reduce his rental prices (1169:17-23);

(iii)     In the brokerage world, there are conflicts between landlords and tenants (1193:2-5); and

(iv)     Landlords and tenants are conflicting and adverse parties (1194:2-7).

Kleinberg testified as follows:

(i)     Kleinberg testified at her deposition that there is no documentation indicating that Siegel ever told Harnden that Siegel gave market information to Weinberg (1258:19-23);

(ii)     Kleinberg has never encountered a situation in which a broker for the tenant sent comps and a CoStar Report to the landlord (1296:1-13); and

9

(iii)     CoStar is an important source for brokers (1297:13-18).

Bergey testified as follows:

(i)     Siegel and Bergey were involved in some of the deals that were included in the comps sent by Siegel and Siegel and Bergey had personal knowledge about those deals (1329:8-14);

(ii)     CoStar is a helpful source of information (134:16-18);

(iii)     The best information on Chelsea comes from market information based on Bergey's "inside and out" knowledge of the Chelsea neighborhood and market (1347:23-1348:6);

(iv)     Bergey testified at his deposition that one probably cannot google comps (1349:24-1350:5); and

(v)     Bergey testified at his deposition that most comps, especially recent comps, are not on the internet (1352:4-7).

### There Is No Legally Sufficient Evidentiary Basis for a Jury to Find Against Defendants' Breach of Contract Counterclaims and Affirmative Defenses

As set forth in Defendants' Objections to the Court's Instructions of Law to the Jury and Verdict Form (ECF 341), there is no damages requirement with respect to a breach of contract affirmative defense for failure to perform a condition precedent. See Art Media, LLC v. Brant, 2021 WL 746261, *4-5 (S.D.N.Y. Feb. 12, 2021).

Pace has pleaded (ECF No. 163, 33rd and 41st Affirmative Defenses) that CBRE failed to perform the March 18, 2014 Agreement and November 5, 2014 Agreement and breached Paragraph 2 of the former and Paragraph B.1 of the latter by:

(i)     Failing to propose and execute an "agreed strategy" with Pace;

(ii)     Failing to "offer advice and guidance" to Pace; and/or

(iii)   Failing to ensure that "[a]ll business and legal decisions will be made solely by" Pace.

In Pace's 33rd and 41st Affirmative Defenses, Pace expressly set forth these "express conditions" and pleaded that they were not performed by CBRE. In Pace's 29th and 30th Affirmative Defenses, Pace enumerated CBRE's failure to offer appropriate advice and guidance, including, inter alia:

(i)   CBRE's failure to request or analyze the April 6, 2000 Lease and/or drafts of the subsequent Leases, a summary and analysis of key lease terms, any proposed term sheets and/or any other relevant documents concerning lease negotiations between Pace and Weinberg; and

(ii)   CBRE's failure to offer and/or provide CBRE's Advisory and Transaction services, including, inter alia, CBRE's financial analysis services, CBRE's location analytics services and/or CBRE's retail analytics services to fully analyze lease documents and provide critical advice concerning financial impacts.

An express condition precedent must be literally complied with before the claimant may recover. See NY PJI 4:1.1(IV. Performance-A.). No action for breach of contract lies where the party seeking to enforce the contract has failed to perform a specified condition precedent. Id.

With respect to Pace's breach of contract counterclaims, "Under New York law, nominal damages are always available in a breach of contract action even if a party cannot prove general or consequential damages." Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Company, 976 F.3d 239, fn10 (2d Cir. 2020); see also Kronos v AVX Corp., 81 N.Y.2d 90, 95-96 (1993); Luitpold Pharmaceuticals, Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie, 784 F.3d 78, 87 (2d Cir. 2015); KT Group Limited v. NCR Corporation, 412 F.Supp.3d 305, 326 (S.D.N.Y. 2019); Magu Realty Company v Spartan Concrete Corp., 239 A.D.2d 469, 470 (2d Dep't 1997); Hirsch Elec. Co. v Community Services, 145 A.D.2d 603, 605 (2d Dep't 1988).

The evidence adduced at trial is clear and uncontroverted that CBRE breached the foregoing conditions precedent by failing to propose and execute an "agreed strategy" with Pace, failing to "offer advice and guidance" to Pace and failing to ensure that "[a]ll business and legal decisions will be made solely by" Pace.

### *Advice and Guidance*

(i) Siegel testified that he had access to CBRE's advisory and transaction services group, but did not consult with them even once (425:6-11);

(ii) Siegel testified that he never asked to review the lease for 540 West 25th Street (481:2-11);

(iii) Siegel testified that he never asked to review the term sheets between Pace and Weinberg (482:23-25; 483:15-20);

(iv) Siegel testified that he never asked to analyze exactly what Weinberg was demanding (483:1-4);

(v) Brennan testified that she did not inquire as to whether CBRE fully complied with its contractual obligation to offer advice and guidance to Pace (943:10-15);

(vi) Michaels testified that he has not seen any evidence that Siegel gave Pace any advice concerning operating expenses (1173:8-15);

(vii) Michaels testified that he has not seen any evidence that Siegel gave Pace any advice concerning real estate taxes (1174:1-4);

(viii) Michaels testified that he has not seen any evidence that Siegel gave Pace any advice concerning compounding (1178:5-7);

(ix) Michaels testified that he did not investigate whether Siegel offered retail analytics services to Pace (1207:20-1208:3); and

    (x)    Michaels testified that some of the advisory and transaction services could be relevant to Pace's transaction with Weinberg and Michaels does not "know what influenced Mr. Siegel not to offer the services" (1208:6-16).

### *Strategy*

    (i)    Siegel testified that an "agreed strategy" was never reduced to writing (468:5-7);

    (ii)    Siegel's claims about "agreed strategy" have changed so many times throughout this litigation as to be worthless.  At trial, Siegel claimed that Harnden handed him a strategy document during one of their initial meetings (453:5-22).  During his deposition, Siegel claimed that: (a) "There really was never a specific pinpoint" for strategy (467:11-14); (b) "The strategy was changing at a moving target" (467:18-21); (c) "The strategy was that I was not going to be in the meetings with the Weinbergs and Glimchers" (473:25-474:4); (d) "The strategy was to find 40 or 50,000 feet in one or numerous locations in Chelsea" (474:10-13); and (e) "The strategy was to begin the search for what I call, what we call the wow space" (474:19-23);

    (iii)    Brennan, CBRE's 30(b)(6) witness, testified that she does not know when and where Siegel met with anyone from Pace and agreed to a strategy (938:18-22);

    (iv)    Brennan testified that she made no effort to inquire about the agreed-upon strategy because "it always happens" and she "just assumed it did" (942:13-16);

    (v)    Michaels testified that he has never been told what Siegel's strategy was (1183:1-3); and

    (vi)    Kleinberg testified that nobody ever discussed with her formulating a strategy for Pace or how "strategy" is defined in the March 18, 2014 Agreement (1281:22-1282:7).

### *Business Decisions*

    (i)    Siegel testified that he made a decision on his own to respond to LW's email and "[i]t's all business" (251:1-11);

    (ii)    Siegel testified that when he responded to LW on October 1, 2014, he "[w]as using [his] best judgment" (254:19-24);

    (iii)    Brennan testified that she assumes that Siegel made a business decision to supply comps and a CoStar Report to LW and that this was a decision that Siegel made in the ordinary course of business at CBRE (943:19-944:19);

    (iv)    Brennan testified that Siegel's decision to supply comps and a CoStar Report to LW was Siegel's decision, not Pace's decision (944:23-945:1); and

    (v)    Michaels testified that Siegel's decision to send comps and a CoStar Report to LW "was under the auspices of a business decision" (1186:23-1187:4).

## **CONCLUSION**

For all of the foregoing reasons, it is respectfully requested that Pace's motion be granted in its entirety, together with such other and further relief as to this Court seems just and proper.

Dated: New York, New York
December 8, 2022

Respectfully submitted,
AARON RICHARD GOLUB, ESQUIRE, P.C.
Attorneys for Defendants

_____s/_____
BY: Nehemiah S. Glanc
24 East 64th Street- Fifth Floor
New York, New York 10065
ph: (212) 838-4811
fx: (212) 838-4869

Of Counsel:
Aaron Richard Golub
Nehemiah S. Glanc
Russell I. Zwerin